## TOCCO v PIERSANTE

1. TORTS—GOVERNMENTAL IMMUNITY—GOVERNMENTAL FUNCTIONS—
   STATUTES.

   Governmental immunity is statutory insofar as the term is used
   to refer to the immunity from tort liability of the state, its
   agencies, counties, municipal corporations, and other political
   subdivisions engaged in the exercise or discharge of governmen-
   tal functions (MCLA 691.1407; MSA 3.996[107]).

2. TORTS—GOVERNMENTAL IMMUNITY—PUBLIC OFFICIALS—COMMON
   LAW.

   No statute purports to grant governmental immunity to public
   officials acting in the line of duty; therefore, the common law
   must be the source of whatever immunity from tort liability
   public officials possess.

3. TORTS—GOVERNMENTAL IMMUNITY—PUBLIC OFFICERS—BREACH OF
   DUTY.

   The doctrine of governmental immunity has no application where
   public officers are sued as individuals for their personal torts
   arising out of their own conduct rather than on the basis of a
   breach of duty imposed on them as public officers only.

4. TORTS—GOVERNMENTAL IMMUNITY—PUBLIC EMPLOYEE—PERSONAL
   NEGLIGENCE—ACTIVE NEGLIGENCE—SCOPE OF EMPLOYMENT.

   A public employee is not personally protected by governmental
   immunity from liability for his own acts of personal or active
   negligence, although performed within the scope of his employ-
   ment.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur 2d, Municipal, School, and State Tort Liability §§ 42–
44, 99–101.

[2–5] 57 Am Jur 2d, Municipal, School, and State Tort Liability §§ 85–
102.

[6–10] 57 Am Jur 2d, Municipal, School, and State Tort Liability
§ 109.

[7–10] 50 Am Jur 2d, Libel and Slander §§ 192–194.

[8] 50 Am Jur 2d, Libel and Slander §§ 193, 231, 242, 243.

[9] 50 Am Jur 2d, Libel and Slander §§ 220–228.

5. Torts—Governmental Immunity—High Executive Officials—Discretionary Matters—Official Duties.

The perimeters of personal immunity for government officials have been defined by case law and that law has not been expanded to include a doctrine which provides immunity from tort liability to high level executive officials when acting in discretionary matters in the course of their official duties.

6. Libel and Slander—Governmental Immunity—Question of Law—Privilege—Undisputed Circumstances.

It is a question of law whether a privilege attaches in a malicious defamation case where the circumstances are undisputed.

7. Libel and Slander—Governmental Immunity—Absolutely Privileged Communications—Qualified Privilege.

An absolutely privileged communication is not actionable, even though false and maliciously published, but proof of actual malice will overcome a qualified privilege.

8. Libel and Slander—Governmental Immunity—Absolutely Privileged Communications—Judicial Hearings—Legislative Proceedings.

An absolute privilege is recognized for communications made by judges during the course of judicial hearings and for statements made in the course of legislative proceedings.

9. Libel and Slander—Absolutely Privileged Communications—Executive Officials.

No absolute privilege in malicious defamation cases is provided for communications made in the line of duty by executive officials.

10. Libel and Slander—Absolute Privilege—Judicial Occasions—Legislative Occasions—Military Occasions.

The rule of absolute privilege in malicious defamation cases is limited to the necessities of judicial, legislative and military occasions.

Appeal from Wayne, Victor J. Baum, J. Submitted April 6, 1976, at Detroit. (Docket No. 24422.) Decided June 24, 1976. Leave to appeal applied for.

Complaint by Jack W. Tocco against Vincent W. Piersante for damages for defamation. Summary

judgment for defendant. Plaintiff appeals. Reversed.

*Weinstein, Kroll & Gordon, P. C.,* and *Bellanca & Beattie,* for plaintiff.

*Frank J. Kelley,* Attorney General, and *Patrick J. Devlin,* Assistant Attorney General, for defendant.

Before: D. F. WALSH, P. J., and R. M. MAHER and M. J. KELLY, JJ.

M. J. KELLY, J. The plaintiff, Jack W. Tocco, brought suit in Wayne County Circuit Court against defendant Vincent W. Piersante, alleging that he had been intentionally and maliciously defamed by the defendant on various occasions and requesting general and exemplary damages.

Defendant filed a motion asking alternatively for accelerated or summary judgment. The trial court granted summary judgment in favor of the defendant and the plaintiff appeals by right.

The trial court dismissed the plaintiff's suit on what were said to be independent and alternate grounds: 1) governmental immunity and 2) absolute immunity of the defendant from tort liability when acting in discretionary matters in the course of his duties as a high-ranking executive officer.

The defendant had relied on a third alternative ground in his motion for accelerated or summary judgment. The final ground was that any statements made by defendant were subject to a qualified privilege and the plaintiff failed to allege circumstances inconsistent with good faith on the part of the defendant which would overcome the privilege. The trial court quickly and properly found that plaintiff's amended complaint raised

issues of malice and wilful and deliberate misconduct which, if proved, would overcome any qualified privilege. This issue was not the basis for disposition below. But we think this is the area in which the battle lines should have been drawn and the adverse claims contested.

The plaintiff's complaint alleged that defendant, chief of the Organized Crime Division of the office of the Michigan Attorney General, had been in part responsible for the production of a widely disseminated motion picture film known as "Your Silent Partner", which film was alleged to have falsely linked the plaintiff with organized crime.

Defendant may fairly be characterized as the moderator of the film and its chief resource person. He is depicted as an expert on organized crime who answers questions posed by four other citizens of the community. The subject matter is organized crime in the Detroit metropolitan area. The scenes shift from a panel discussion type format to various instances of organized criminal activity, including gambling, prostitution, narcotics traffic, labor racketeering, corruption of government officials and the like.

A portion of the film goes on to show that ill-gotten proceeds of such activites have been used to acquire ownership interests in businesses which appear to be legitimate. A company in which plaintiff claims to have a financial interest is shown as one such business. The plaintiff's name and face appear in the film as one who claims to be a legitimate businessman but who is linked to organized crime, a member of the "Mafia".

Affidavits, exhibits and depositions submitted to the trial court by the parties indicate that funding of the film was arranged by the Office of Criminal Justice Programs (O.C.J.P.) an agency of the State

of Michigan in the executive branch of government, established by the Governor pursuant to Federal statute to oversee the receipt and distribution of Federal grant monies used in assisting state law enforcement efforts. The film was financed by a combination of Federal and private funds. The O.C.J.P. approved the project which resulted in the film, oversaw its production and distribution, and assumed responsibility for the publication of the film as an official agency action.

More directly involved in overseeing the production of the film itself was the Organized Crime Prevention Council, (O.C.P.C.) a branch of the O.C.J.P. Members of the O.C.P.C. are appointed by the Governor and include the Michigan Attorney General, the Director of the State Police, the Wayne County Prosecutor, the Washtenaw County Prosecutor, the Detroit Police Commissioner and the Sterling Heights Police Chief.

Defendant was designated by the Attorney General as his personal representative and substitute at meetings of the O.C.P.C. and the O.C.J.P. In addition, a part of the defendant's official duty as chief of the Organized Crime Division of the office of the Michigan Attorney General, according to an affidavit submitted by the Attorney General, was to direct educational and informational activities to acquaint the public with dangers presented by organized crime.

It is alleged by plaintiff that defendant was responsible for the insertion of plaintiff's name and face in the film; that the defendant, by means of the film, imputed to the plaintiff a connection with organized crime and specifically the Mafia; that such imputations were false and were known by defendant to be false; and that defendant's purpose was to harm the plaintiff's reputation, business and family because of personal ill will.

Plaintiff blames defendant for the insertions beyond any official responsibility defendant has as a participant in decisions of the O.C.P.C., on the basis that defendant personally assured members of the council that there was substantiation of plaintiff's alleged Mafia involvement. It is also alleged that the council relied to some extent on an exhibit linking plaintiff's business to organized crime which was presented to a congressional committee in 1963 and published in the Congressional Record. Defendant is alleged to be the source of the information relied on by that congressional committee, having headed a project to prepare that exhibit while a member of the Detroit Police Department. These allegations are not without support in the record thus far developed in this case. Plaintiff says that all such information was false and known by defendant to be false.

Plaintiff alleges that defendant has been present at public screenings of the film and has reinforced and supplemented the defamatory references in the course of commenting on the film.

Plaintiff challenges the propriety of the trial court's dismissal of his action.

## I

## GOVERNMENTAL IMMUNITY

Governmental or sovereign immunity insofar as the term is used to refer to the immunity from tort liability of the state, its agencies, counties, municipal corporations, and other political subdivisions engaged in the exercise or discharge of governmental functions, is statutory. MCLA 691.1407; MSA 3.996(107). No statute purports to grant any such immunity to public officials acting in the line of duty. On the contrary, the only relevant statu-

tory reference to personal liability of public officials authorizes, but does not require, governmental agencies to indemnify officers and employees against whom a judgment for damages has been awarded "as a result of any civil action for personal injuries or property damage caused by the officer or employee while in the course of his employment and while acting within the scope of his authority". MCLA 691.1408; MSA 3.996(108). Therefore, the common law must be the source of whatever immunities from tort liability are possessed by public officials.

Defendant asserts that governmental immunity protects him under the circumstances of this case because it is clear that the film in question was funded, produced, edited, approved and distributed by a state agency, the O.C.J.P., in the course of its official duties; that the agency itself is immune from tort liability and that defendant must therefore also be protected by immunity because he is being sued for actions done by the state agency. Defendant relies on *Rose v Mackie,* 22 Mich App 463; 177 NW2d 633 (1970), *Nichols v Zera,* 33 Mich App 274; 189 NW2d 751 (1971), *McDowell v Warden of Michigan Reformatory at Ionia,* 169 Mich 332; 135 NW 265 (1912), and *Longstreet v County of Mecosta,* 228 Mich 542; 200 NW 248 (1924). These cases are not on point and do not extend the shield of governmental immunity to the defendant.

*McDowell, supra,* was an action to recover damages for breach of contract from the defendant, warden of Ionia Reformatory, who had signed a contract in his official capacity while acting as agent for the state. The contract upon which the suit was brought was thus one with the state, not the employee. The language used by the Supreme

Court in that case, to the effect that it would look "through and beyond the nominal parties" to the real party in interest, the state, while appropriate in its own factual context, has no application to a case alleging an intentional and malicious commission of a common law tort. The state agency is not the real party in interest here as defendant is in effect charged with an intentional and wrongful manipulation of the members of that agency as well as other independent actions in which the agency did not partake, in order to harm the plaintiff. We find no Supreme Court case affording governmental immunity to any public official against whom such allegations had been made.

*Longstreet v County of Mecosta, supra,* held the individual members of a board of county road commissioners and the State Highway Commissioner free from personal liability for injuries caused to motorists injured due to inadequate warning lights and barriers at a site where a bridge was under construction. The Court noted that, as to the individual board members, no allegations of wilful negligence had been made. It concluded that inasmuch as the duties alleged to have been violated by the board members individually were duties running to the public generally rather than to individual members of the public, allegations of neglect in carrying out such duties set forth no cause of action against the individual members. The same reasons precluded personal liability on the part of the State Highway Commissioner. The Court discussed separately the question of the liability of the State Highway Commissioner in his official capacity, and said that the question could be decided simply on the basis that such a suit would in reality be one against the state, which would be the real party in interest,

and was thus precluded in the absence of consent by the state.

The Court noted the distinction between the personal liability of a state officer, and the liability of his office, which would in effect amount to liability of the state. The latter has no application in the case now before us as defendant is sued only in his individual capacity. Moreover, defendant's individual personal liability is not controlled by *Longstreet,* as he is not charged with negligence in the performance of his official duties but rather with an intentional and malicious common law tort.

*Rose v Mackie, supra,* inferentially supports this thesis. There the defendant State Highway Commissioner was being sued for damages resulting from an automobile accident on a state highway. Negligence on the part of the defendant was alleged, both in his capacity as State Highway Commissioner and personally. This Court dismissed the count of the complaint alleging negligence on the part of the defendant in his official capacity with respect to his duties in overseeing the highways and ensuring their safety. Citing *Longstreet, supra,* we said merely that since the state was immune, the State Highway Commissioner was also immune.

The second count of the complaint charged Mr. Mackie personally with "wanton and wilful" negligence based on an alleged failure to cause changes in the design and construction of the highway in question despite possessing knowledge of its dangers. As in *Longstreet,* it was concluded by the Court that inasmuch as the duty alleged to have been violated by the defendant was an official duty, running to the public generally rather than to the plaintiffs individually, and since no actions

of the defendant could be said to have been directed at the plaintiffs other than as members of the public, there could be no personal liability on the part of the defendant.

The decision in *Nichols v Zera, supra,* relying on *Daniels v Board of Education of City of Grand Rapids,* 191 Mich 339; 158 NW 23 (1916), held only that individual members of a board of education, who were not alleged to have personally committed any torts, possessed immunity from tort liability based upon the collective action or inaction of such board members.

In contrast to these cases, defendant here is personally alleged to have intentionally and maliciously defamed plaintiff. The duty alleged to have been violated is not an official duty running to the public generally but rather a common law duty to the plaintiff to refrain from defaming him.

*Lovitt v Concord School District,* 58 Mich App 593; 228 NW2d 479 (1975), indicates that the doctrine of governmental immunity has no application where public officers are sued as individuals for their personal torts arising out of their own conduct, rather than on the basis of a breach of duty imposed on them as public officers only. See also *Rush v Pierson Contracting Co,* 310 F Supp 1389, 1397–1398 (ED Mich, 1970), concluding that no Michigan authority supported the proposition that a public employee would be personally protected by governmental immunity from liability for his own acts of personal or active negligence, though performed within the scope of his employment.

Several early Supreme Court decisions indicate that no protection is afforded public officials for intentional or malicious conduct. *Raynsford v Phelps,* 43 Mich 342, 345; 5 NW 403 (1880), *People,*

*for use of Lapeer County Bank v O'Connell,* 214 Mich 410, 411–412; 183 NW 195 (1921). The latter case held that a county drain commissioner would be liable for damages caused as a result of his issuing orders of payment for construction work done pursuant to a contract where such orders were issued in violation of a statute prohibiting payment of more than two-thirds of the amount earned on a contract until the work had been accepted by the commissioner. The orders were issued before any work had been done under the contracts and the commissioner's action was therefore a wilful and intentional violation of his public duty.

Nor do we view the recent decision in *Walkowski v Macomb County Sheriff,* 64 Mich App 460; 236 NW2d 516 (1975), as being contrary to this conclusion. There it was held that the Director of the Michigan State Police Department, named in that capacity as a defendant along with other police officers of the Macomb and St. Clair County Sheriff's Departments and the Michigan State Police Department, was entitled to accelerated judgment on the basis of governmental immunity. Although the complaint alleged assault, battery, false arrest, unlawful imprisonment and defamation, all intentional common law torts, it is apparent on the facts that any liability of the Director of the State Police would have been premised on the possibility of negligence in exercising control over the operations of the Law Enforcement Information Network (LEIN). The LEIN system used the same code number for two offenses of differing gravity, resulting in the plaintiff being taken into custody when the LEIN system gave forth the information that she was wanted on a warrant for the greater charge.

## II

### Immunity for Executive Official

We turn to the second ground relied on by the trial court in dismissing plaintiff's complaint, the application of a doctrine providing immunity from tort liability to high level executive officials acting in discretionary matters in the course of their official duties. The trial court chose to rely upon this doctrine in preference to determining whether an absolute privilege in defamation would be available to the defendant under the circumstances of this case.

The doctrine relied on below is well developed in the Federal law which provided the source of much of the trial court's thoughtful and well-documented opinion. It has not been specifically adopted in this state. After discussing Federal, state common law and state statutory implementation of the doctrine, the trial court observed:

"It has been authoritatively said that the jurisdictions favoring absolute immunity are in the majority,[16] and that, 'The position of the Michigan Supreme Court is very hard to determine'.[17]

"In Michigan, is official immunity absolute or qualified? While the matter is not free from doubt, I conclude that in Michigan there is absolute immunity for high ranking officers of the executive branch in connection with discretionary activity in the performance of their official duties."

"[16] *Wilson v Hirst,* 67 Ariz 197; 193 P2d 461 (1948); Davis, *Admin Law,* 526, 542, 543.

"[17] Becht, 'The Absolute Privilege of the Executive in Defamation,' 15 *Vanderbilt L R* 1127, 1154 (1962)."

The court then went on to cite and discuss *Schlinkert v Henderson,* 331 Mich 284; 49 NW2d

180 (1951), and *MacGriff v Van Antwerp,* 327 Mich 200; 41 NW2d 524 (1950). We distinguish these cases by observing that in *Schlinkert* the Supreme Court relied on MCLA 436.12; MSA 18.983, which provided immunity for the members of the Liquor Control Commission and in *MacGriff* the defendants were prosecuting attorneys and their actions were held to be statutorily privileged under 1948 CL 767.3, 767.20 and 767.22.

The thorough and scholarly opinion of the trial judge may portend the recognition of a sleeping common law immunity for the discretionary acts of high ranking public officials. The trial judge sets forth 13 cogent reasons for adopting the doctrine. We disclaim none of them. We hold only that the perimeters of personal immunity of government officials has been defined by Michigan case law and we decline to expand those perimeters so as to afford absolute immunity under the aegis of a doctrine not heretofore recognized in Michigan.

### III

### PRIVILEGE IN DEFAMATION

This leaves us with the question of privilege in defamation. The court below opted for, but did not rely on the existence of an absolute privilege in defamation as a basis for dismissing plaintiff's complaint. To avoid a shuttle bus effect on remand, we will determine whether such a privilege exists here. The question of whether or not a privilege attaches under undisputed circumstances is a question of law for the judge. *Bostetter v Kirsch Co,* 319 Mich 547; 30 NW2d 276 (1948), *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719 (1959); See *Harrison v Arrow Metal Products Corp,*

20 Mich App 590, 609–610; 174 NW2d 875 (1969), where it was said:

"The term privilege relates to a situation or occasion in which the importance of the criticism published justifies a modification or indeed a withdrawal of the protection normally afforded to our citizens' reputations. The privilege thus afforded is not, however, a constant. It varies with the situation. At one extreme we have loose gossip, thoughtless or malevolent. Here there is no privilege. At the opposite extreme we have absolute privilege. In between we have qualified privilege."

A communication absolutely privileged is not actionable, even though false and maliciously published, whereas proof of actual malice will overcome a qualified privilege. *Trimble v Morrish,* 152 Mich 624, 627; 116 NW 451 (1908), *Lawrence v Fox, supra, Timmis v Bennett,* 352 Mich 355; 89 NW2d 748 (1958), Prosser, Torts (4th ed), § 114, pp 776–777.

Michigan has recognized an absolute privilege for communications made by judges during the course of judicial hearings. *Ginger v Wayne Circuit Judge,* 369 Mich 680; 120 NW2d 842 (1963), *Mundy v McDonald,* 216 Mich 444; 185 NW 877 (1921). This privilege is well known and universally recognized, albeit sometimes with minor modifications not relevant here.

An absolute privilege is also generally recognized for statements made in the course of legislative proceedings. Prosser, Torts (4th ed), § 114, pp 781–782. This privilege has also been adopted in Michigan. *Bolton v Walker,* 197 Mich 699; 164 NW 420 (1917), *Trebilcock v Anderson,* 117 Mich 39; 75 NW 129 (1898), *Wachsmuth v The Merchants' National Bank,* 96 Mich 426; 56 NW 9 (1893).

If it were to be assumed that the O.C.P.C. was acting in a quasi-judicial or quasi-legislative manner in deciding what should be included in the film, particularly in deciding whether plaintiff's name, face and business would be included, this would imply only that statements made by defendant to the council in the course of debate . or similar manner so as to influence their decision would be absolutely privileged. Plaintiff's cause of action, however, rests on alleged publications which would not fall into this category.

It is here claimed that while defendant was present at various public screenings of the film, he condoned and supplemented the allegedly defamatory remarks. It is also claimed that defendant circulated copies of the Congressional Record of August 12, 1969, with the knowledge that the record contained false defamatory statements with the intent to injure plaintiff. Finally, with respect to disseminating the film, it is claimed the defendant caused numerous public screenings. We do not view any quasi-judicial or quasi-legislative privilege as having any relevance on such occasions of public dissemination.

Defendant would have us declare the publications as having been made on occasions of absolute privilege. We are referred to a line of Federal cases following United States Supreme Court decisions in *Spalding v Vilas,* 161 US 483; 16 S Ct 631; 40 L Ed 780 (1896), and *Barr v Matteo,* 360 US 564; 79 S Ct 1335; 3 L Ed 2d 1434 (1959). In *Spalding* the Supreme Court held that the head of an executive department, there the Postmaster General, would have the protection of such absolute immunity when engaged in the discharge of official duties. In *Barr* the privilege was extended to all lower Federal officers and employees and

said to include all publications within the "outer perimeter" of their "line of duty" including defamatory press releases explaining their conduct to the public.

Defendant urges that the *Barr v Matteo* rule providing an absolute privilege for executive communications made in the line of duty is also the rule in Michigan. As an executive official, Chief of the Organized Crime Division of the Office of the Michigan Attorney General, defendant would thereby have the protection of an absolute privilege. Any actions by this defendant which informed the public that plaintiff, or any other individual, was linked to organized criminal activity, the argument goes, must therefore be viewed as having been in the pursuit of his official duties. Lending strong support to the argument are *Sauber v Gliedman,* 283 F2d 941 (CA 7, 1960), *cert den,* 366 US 906; 81 S Ct 1047; 6 L Ed 2d 204 (1961), and *Matson v Margiotti,* 371 Pa 188; 88 A2d 892 (1952).

In *Sauber,* the defendant was a special assistant to the United States Attorney General, appointed for the purpose of prosecuting plaintiff, a former district director of the Internal Revenue Service, on charges of conspiracy to defraud and other charges. It was held that the allegedly malicious action by defendant in publishing defamatory statements about plaintiff at a press conference were absolutely privileged inasmuch as defendant's duties included conducting relations with the press, the statements to the press "related to the subject matter of Gliedman's assignment," and the public had a right to be informed of the steps being taken to investigate and correct official abuses of authority. *Sauber, supra,* at 944.

Similarly, in *Matson, supra,* it was held that the

Pennsylvania Attorney General was acting within the course of his official duties, and was thus protected by absolute privilege in a suit alleging malicious defamation. He sent a letter to a county district attorney accusing the plaintiff, an assistant district attorney, of Communist activities and sympathies, and released the communication to the press. With respect to whether the release of the letter to the press was within the scope of the attorney general's official duties, the Pennsylvania Court held that it was, as the public interest required that the attorney general keep the public advised of his official acts and conduct otherwise within the scope of his official duties. *Matson, supra,* at 900.

The question is whether a similar rule obtains in this jurisdiction. We hold that it does not and that defendant under the circumstances of this case, is entitled to a qualified, not an absolute, privilege.

Defendant urges *Schlinkert v Henderson, supra,* as precedent. As we have noted, there the Supreme Court held that defendant Liquor Control Commissioner was protected from suit by absolute statutory privilege; that the Legislature, in passing the statute, " * * * intended to and did grant to the commission in question and each member thereof, a greater immunity than they would otherwise have". 331 Mich at 288. The remainder of the opinion considered whether the defendant had been acting in the course of his duties in publishing the allegedly defamatory statements, and it was concluded that he had been, thus making the statutory privilege applicable. No statutory privilege applies here.

Another case sometimes cited for absolute privilege is *Powers v Vaughan,* 312 Mich 297; 20 NW2d

196 (1945). There the plaintiff, a masseur, had failed an examination which was a prerequisite to obtaining a license to practice in Detroit. He filed a petition with the Detroit Common Council to be granted a license to practice notwithstanding his failure to pass the examination. Defendants, one a member of the Detroit Board of Health and the other a supervising nurse in the Detroit Board of Health, prepared an answer to plaintiff's petition and submitted it to the Common Council. Plaintiff claimed libel based on statements made in the answer.

The Supreme Court upheld the trial court's grant of a judgment *non obstante veredicto* in favor of the defendants. It noted that previous cases had held communications of a similar nature to be absolutely privileged. The cases which were cited for this proposition, as well as the facts of the case itself indicate strongly that absolute privilege, if applicable, would have been appropriate because the communication involved was made in the course of the performance of a quasi-judicial or quasi-legislative function by the Detroit Common Council, not because the communication was made by an executive official or employee in the course of performing his official duties. Moreover, the Supreme Court did not unequivocally hold that an absolute privilege attached, as it went on to say that even if only a qualified privilege attached, the trial court had correctly granted judgment for the defendants because the plaintiff had failed to establish malice so as to overcome even a qualified privilege. *Powers, supra,* at 305–307.

The major Michigan case in favor of the plaintiff's assertion that an executive involved in carrying out his official duties has only a qualified privilege in defamation is *Raymond v Croll,* 233

Mich 268; 206 NW 556 (1925). In that case, the plaintiff was an unsuccessful bidder for a state construction project who alleged that his bid had been rejected despite the fact that he had been the lowest bidder. The plaintiff alleged that the defendant, a state official entitled "Budget Director", whose duties required him to investigate the financial responsibility of bidders on some state construction projects, had falsely and maliciously reported to the state administrative board that the plaintiff was not qualified to perform the contract, could not finance the job, had trouble paying his men on former jobs, and had had trouble with the district engineers. The plaintiff alleged that the statements were made by the defendant for the purpose of injuring the plaintiff and securing the contract for the next lowest bidder with whom the defendant was associated in business.

The plaintiff recovered a verdict and judgment against the defendant in circuit court. On appeal, the defendant asserted that the trial court had erred in denying his motion for a directed verdict and for judgment notwithstanding the verdict on the ground that the defendant's statements were absolutely privileged. The Supreme Court stated that it had recognized a rule of absolute privilege, but had " * * * repeatedly refused to extend its application beyond the necessities of the judicial, legislative, and military occasions". *Raymond v Croll, supra,* at 273. The Court ruled that although the defendant had no absolute privilege on the occasion in question, not being a member of the state administrative board and having no duties or relations to any legislative body that would have clothed him with such a privilege, he did have a qualified privilege because he did have a duty to communicate information concerning the financial responsibility of the plaintiff or the plaintiff's abil-

ity to perform the contract to the state administrative board. The Court concluded that a qualified privilege attached to the statements of the defendant and that the plaintiff had failed to sustain his burden of proving that the defendant had acted with malice. *Ibid* at 276.

The trial judge distinguished the *Raymond* case on the basis that defendant Croll was not of such a high rank as to be entitled to claim absolute privilege and that his activities were ministerial rather than discretionary. The *Raymond* Court, however, had relied on no such grounds in declining to extend an absolute privilege to the circumstances involved. Rather, the Court indicated that absolute privilege would be limited to legislative, judicial, and military occasions.

Support is found for this view in *Ginger v Wayne Circuit Judge, supra,* and cases cited therein at 683. The Court made no mention of *Schlinkert* or *Powers,* but quoted language from *Raymond v Croll* indicating that absolute privilege in defamation was limited in Michigan to the necessities of judicial, legislative and military occasions. Since the issue decided in *Ginger* concerned only the privilege recognized for judicial proceedings, it does not provide precedent directly applicable to the instant case. However, the language used in that case would seem to provide some insight into what the Supreme Court considers to have been decided by its prior decisions concerning absolute privilege in defamation for public officials.

We conclude that the *Spalding-Barr* rule of absolute privilege for communications of executive officials has never been adopted in Michigan and that *Raymond v Croll, supra,* must control this case, thus providing the defendant with no more than a qualified privilege.

Reversed.