DAVIS v LHIM

Docket No. 59284. Submitted October 19, 1982, at Detroit.—Decided
    March 21, 1983. Leave to appeal applied for.

Plaintiff, Ruby Davis, administratrix of the estate of Mollie
    Barnes, deceased, brought a wrongful death action against Dr.
    Yong-Oh Lhim, a staff psychiatrist at Northville State Hospital,
    a state mental hospital. Mollie Barnes was shot and killed by
    her son, John Patterson, who had been a patient at Northville
    under Dr. Lhim's care. Plaintiff alleged negligence in Dr.
    Lhim's discharge of Patterson and breach of duty to warn
    Mollie Barnes of the danger Patterson posed to her. The Wayne
    Circuit Court, Lucile A. Watts, J., entered judgment for plain-
    tiff on a jury verdict. Defendant appealed. *Held:*

1. A staff psychiatrist at a state mental institution is not
immune from liability for negligent discharge of a patient.

2. A psychiatrist owes a duty of reasonable care to persons
who are readily identified as foreseeably endangered by his
patient. Danger to a third person is foreseeable where the
psychiatrist determines, or pursuant to the standard of his
profession should determine, that his patient presents a serious
danger of violence to another.

3. An intervening cause is not an absolute bar to liability for
negligence; liability is preserved where the intervening cause is
foreseeable. The intervening causes in the death of Mollie
Barnes were foreseeable.

4. The jury's verdict was not against the great weight of the
evidence.

5. The court properly denied defendant's motion to amend his

REFERENCES FOR POINTS IN HEADNOTES
[1] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 88.
    63 Am Jur 2d, Public Officers and Employees § 288.
[2, 6] 57 Am Jur 2d, Negligence §§ 37, 117 *et seq.*
    61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 242.
[3] 57 Am Jur 2d, Negligence § 158.
    61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 246.
[4] 57 Am Jur 2d, Negligence §§ 209-212, 222.
[5] 22 Am Jur 2d, Death §§ 179, 182.

witness list. The applicable court rule required a showing of good cause, which was not shown.

6. Plaintiff may recover damages for injury suffered by decedent's siblings despite the fact that she was survived by a husband, son and father. The class of persons entitled to share in the distribution of the amount recovered in a wrongful death action encompasses the theoretical group of potential heirs under the laws of intestate succession who can prove a compensable injury and not merely the actual heirs identifiable at the time of the decedent's death.

Affirmed.

CYNAR, J., dissented. He would hold that defendant was not liable because of governmental immunity.

OPINION OF THE COURT

1. GOVERNMENTAL IMMUNITY — PUBLIC EMPLOYEES — SCOPE OF EMPLOYMENT.

A public employee is protected by governmental immunity only if his tortious conduct falls within the scope of his employment; a negligent act falls within the scope of a public employee's employment only if the duty breached is imposed because of his public employment; the duty must be dependent upon public employment.

2. GOVERNMENTAL IMMUNITY — MENTAL HEALTH — PSYCHIATRISTS — DISCHARGE OF PATIENTS.

A staff psychiatrist at a state mental institution is not immune from liability for negligent discharge of a patient.

3. NEGLIGENCE — PSYCHIATRISTS — DUTY TO THIRD PERSONS.

A psychiatrist owes a duty of reasonable care to persons who are readily identified as foreseeably endangered by his patient; danger to a third person is foreseeable where the psychiatrist determines, or pursuant to the standard of his profession should determine, that his patient presents a serious danger of violence to another.

4. NEGLIGENCE — DEFENSES — INTERVENING CAUSE.

An intervening cause is not an absolute bar to liability for negligence; liability is preserved where the intervening cause is foreseeable.

5. DEATH — WRONGFUL DEATH — DESCENT AND DISTRIBUTION.

The class of persons entitled to share in the distribution of the amount recovered in a wrongful death action encompasses the theoretical group of potential heirs under the laws of intestate

succession who can prove a compensable injury and not merely the actual heirs identifiable at the time of the decedent's death (MCL 600.2922[2]; MSA 27A.2922[2]).

DISSENT BY CYNAR, J.

6. GOVERNMENTAL IMMUNITY — MENTAL HEALTH — PSYCHIATRISTS —
   DISCHARGE OF PATIENTS.
   *A staff psychiatrist at a state mental institution is immune from liability for negligent discharge of a patient.*

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Steven G. Silverman),* for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *George L. McCarger* and *Craig Atchinson,* Assistants Attorney General, for defendant.

Before: R. M. MAHER, P.J., and BRONSON and CYNAR, JJ.

R. M. MAHER, P.J. In this wrongful death case, defendant appeals by right from the judgment entered for plaintiff upon a jury verdict.

In 1975, defendant, a staff psychiatrist at the Northville State Hospital, had under his care John Patterson, the son of plaintiff's decedent, Mollie Barnes. Patterson had a long history of psychological disorder, having voluntarily signed himself into Northville on six occasions from 1972 to 1975 with complaints of insomnia, depression and hallucinations. Defendant first provided Patterson with psychiatric care from July 17, 1975, to August 4, 1975. Patterson returned to defendant's care on August 21, 1975, and remained until September 3, 1975. On both occasions, defendant was diagnosed as suffering from schizophrenia.

Patterson's last admission to Northville was on

a formal voluntary order. When Patterson asked to be released on September 2, 1975, defendant discharged him the following day. Patterson was to be released into the care of his mother, Mollie Barnes, a resident of Detroit. At the time, however, his mother was visiting her relatives in Montgomery, Alabama. Patterson stayed with other relatives in Detroit until October, when he became difficult to manage, and his aunt, Ruby Davis, took him to his mother in Alabama. On November 2, 1975, Patterson began firing a shotgun in his aunt's house, where his mother was staying. His mother tried to talk Patterson out of shooting again, then attempted to restrain him. In the struggle, Patterson fired several more shots, one of which struck and killed his mother.

Ruby Davis, as administratrix of the estate of Mollie Barnes, brought suit against the defendant and Northville State Hospital. In her complaint, plaintiff alleged that defendant's negligent discharge of Patterson was the proximate cause of Mollie Barnes's death. Plaintiff was allowed to amend her complaint during the trial to allege that the defendants negligently failed to warn Mollie Barnes that Patterson was a danger to her safety. Plaintiff sought to recover damages for the loss of love and affection suffered by herself and other siblings of Mollie Barnes.

After a trial that lasted several days, the jury returned a verdict for plaintiff in the amount of $500,000. Defendant moved for judgment notwithstanding the verdict or, in the alternative, a new trial, arguing the same points he now raises on appeal. The trial court denied the motion and defendant appealed.

Defendant raises seven issues, each of which we discuss in turn.

I

Defendant contends that he is cloaked with governmental immunity and, therefore, cannot be held liable for the death of Mollie Barnes. Government agencies are guaranteed statutory immunity from tort liability where the agency is engaged in the exercise or discharge of a governmental function. MCL 691.1407; MSA 3.996(107). A state-operated psychiatric hospital is protected by governmental immunity. *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 (1978). The governmental immunity statute, however, applies only to government agencies. A public employee's immunity, if any, must rest on a different ground.

This Court is divided on the proper test of a public employee's immunity from liability for negligence. Some panels have held that an employee is immune if his allegedly tortious conduct involved discretionary rather than ministerial acts. See, *e.g., Cook v Bennett,* 94 Mich App 93; 288 NW2d 609 (1979); *Fuhrmann v Hattaway,* 109 Mich App 429; 311 NW2d 379 (1981). Other panels find an employee is immune where his act "falls within the scope of his employment". See, *e.g., Everhart v Bd of Ed of Roseville Community Schools,* 108 Mich App 218; 310 NW2d 338 (1981); *Gaston v Becker,* 111 Mich App 692; 314 NW2d 728 (1981); *Lewis v Beecher School System,* 118 Mich App 105; 324 NW2d 779 (1982); *Shwary v Cranetrol Corp,* 119 Mich App 736; 326 NW2d 627 (1982). The Supreme Court has not clearly endorsed either view. However, in *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979), a majority of the justices appeared to apply the "scope of employment" test. In that case, the plaintiff brought an action against, *inter alia,* various employees of the Wayne County jail, alleging negli-

gent operations of the jail resulting in plaintiff's injuries. A majority of the Court in separate opinions held that these employees were protected by governmental immunity. Justice Moody found that "the officers and employees of the county, while acting within the scope of their employment maintaining a jail, primarily are performing essential public duties. Thus, they are immune from alleged negligent actions or selection of personnel." *Id.,* p 84 (Moody, J., *concurring in part and dissenting in part).* Chief Justice Coleman, in her opinion, in which Justice Ryan concurred, agreed with Justice Moody. Finally, Justice Williams appeared to hold that the employees were immune because their negligent conduct was not *ultra vires.* Consequently, a majority of the Supreme Court has held, in effect, that a public employee is protected by governmental immunity only if his alleged tortious conduct falls within the "scope of his employment".

Plaintiff proceeded on two theories of negligence by defendant. First, plaintiff alleged that defendant negligently authorized Patterson's discharge from Northville. Second, plaintiff charged that defendant failed to warn Mollie Barnes of, or take other steps to protect her from, the danger Patterson posed to her. If these negligent acts do not fall within the scope of defendant's employment as a staff psychiatrist in a state-run mental hospital, defendant cannot invoke immunity.

A negligent act falls within the scope of the actor's employment only if the duty he breached is imposed on him because he is a public employee. See *Galli v Kirkeby,* 398 Mich 527; 248 NW2d 149 (1976) (Coleman, J., *dissenting); Lovitt v Concord School Dist,* 58 Mich App 593; 228 NW2d 479 (1975), *overruled in part* 398 Mich 527, 536 (1976);

*Wynn v Cole,* 68 Mich App 706; 243 NW2d 923
(1976); *Tocco v Piersante,* 69 Mich App 616; 245
NW2d 356 (1976), *lv den* 399 Mich 882 (1977); *Cole
v Rife,* 77 Mich App 545; 258 NW2d 555 (1977).
The test is perhaps better labeled "duty dependent
upon public employment". This avoids confusion
with the theory of *respondeat superior,* which
sometimes employs the phrase "scope of employ-
ment". We do not perceive the immunity of a
public employee to be coextensive with his job
assignment, whatever that might be. When a gov-
ernment employee allegedly is negligent in the
performance of some task unique to government,
such as operation of a jail, *Lockaby, supra,* and
has breached a duty which has as its sole basis his
government employment and which is not shared
by those outside government employment, then he
can avoid liability. In formulating this test, we are
merely returning to established principles. Over a
century ago, Justice Cooley distinguished between
a government official's public duties and private
duties. Cooley on Torts, pp 385-390. As one exam-
ple of public duties, Justice Cooley offered the
policeman walking his beat. If he fails in his duty
of vigilence and a crime is committed, the victim
of the crime has no claim against him.

The defendant's duty to use reasonable care in
the discharge of patients is not dependent upon his
position at a state institution. All psychiatrists,
whether employed by a state institution or private
facility, are subject to a duty to exercise compe-
tent, professional judgment in all aspects of treat-
ment of their patients, including the decision to
discharge a patient from custodial care. Conse-
quently, defendant is not immune from liability
for negligent discharge.

There remains the allegation that defendant

negligently failed to warn Mollie Barnes. As explained below, this duty is not uniquely dependent upon the defendant's position as a staff psychiatrist in a state-run psychiatric hospital. Rather, this duty stems from the general common-law principle that an individual must use due care towards another person. Every psychiatrist, whether employed at a state mental hospital or in a private practice, is subject to this duty. The defendant is not immune from liability for the breach of a common-law duty. See *Cole v Rife, supra.*

## II

Defendant contends that he was under no duty to use reasonable care to protect Mollie Barnes against the dangerous activities of her son. In analyzing this argument, first, we must consider in what circumstances, if any, a psychiatrist may owe a duty of due care to a person injured by one of his patients. Next, we need to examine the evidence to determine if, on the facts presented, the jury could find defendant owed such a duty.

## A

Although a question of first impression in Michigan, decisions from other jurisdictions have held that, under certain circumstances, a psychiatrist does owe a duty to use reasonable care to protect third persons from the harmful acts of his patient. See, *e.g., Leedy v Hartnett,* 510 F Supp 1125 (MD Pa, 1981) (interpreting the law of Pennsylvania), aff'd 676 F2d 686 (CA 3, 1982); *Lipari v Sears, Roebuck & Co,* 497 F Supp 185 (D Neb, 1980) (interpreting the law of Nebraska); *Tarasoff v Regents of University of California,* 17 Cal 3d 425;

131 Cal Rptr 14; 551 P2d 334 (1976); *McIntosh v Milano,* 168 NJ Super 466; 403 A2d 500 (1979); *Dep't of Health & Rehabilitative Services v Mc-Dougall,* 359 So 2d 528 (Fla App, 1978).

*Tarasoff v Regents of University of California, supra,* is the leading case. In *Tarasoff,* Prosenjit Poddar, a psychiatric outpatient at a University of California hospital, killed Tatiana Tarasoff. Her parents sued the defendant, alleging that it negligently failed to protect their daughter from Poddar. Defendant contended on appeal that it was under no duty to ensure the safety of Tatiana. In analyzing defendant's claim, the California Supreme Court began:

"As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" *Tarasoff, supra,* pp 434-435; 551 P2d 342. (Citations omitted.)

Under the common law, no one owes any duty to protect an individual who is endangered by a third person *unless* he has some special relationship with either the dangerous person or the potential victim. *Tarasoff, supra,* p 435. See, *e.g., American States Ins Co v Albin,* 118 Mich App 201, 206; 324 NW2d 574 (1982). The California court found that a psychiatrist has such a "special relationship" to his patient. Consequently, the court held that, under certain circumstances, a psychiatrist owes a duty to use reasonable care to protect persons endangered by his patient.

Michigan case law supports the *Tarasoff* holding. "Duty" is one of six elements of an action for negligence. *Moning v Alfono,* 400 Mich 425, 437; 254 NW2d 759 (1977). Moreover, "in negligence cases, the duty is always the same, to conform to

the legal standard of reasonable conduct in light of the apparent risk". Prosser, Torts (4th ed), § 53, p 324, cited in *Moning v Alfono, supra,* p 437.

Whether an individual owes a duty of reasonable care to another depends "in part on foreseeability—whether it is foreseeable that the actor's conduct may create a risk of harm to the victim * * *". *Moning v Alfono, supra,* p 439. Where a third person causes the harm, Michigan law may hold the defendant liable for that person's act even if the defendant bears a special relationship to neither the third person nor the victim. On at least one occasion, our Supreme Court has found a duty to protect the plaintiff from foreseeable harm where no special relationship existed. In *Davis v Thornton,* 384 Mich 138; 180 NW2d 11 (1970), the defendant left his car unattended with the keys in the ignition. Subsequently, a gang of youths took the car for a "joyride" and, while frolicking, injured plaintiff. Although the defendant had no special relationship to either the joyriders or the plaintiff, the court held that a jury could find him liable.

More on point is this Court's decision in *Knight v Michigan,* 99 Mich App 226; 297 NW2d 889 (1980). In *Knight,* a state-run training school placed a mentally retarded individual on plaintiff's farm. Subsequently, the retarded individual set a fire destroying the contents of plaintiff's barn. Plaintiff sued the state, alleging that it was negligent in placing an individual with fire-setting propensities on plaintiff's farm without informing him of that fact. In analyzing whether the defendant owed a duty to the plaintiff, the *Knight* panel wrote:

"One who takes charge of a person having known propensities for danger is under a duty to exercise

reasonable care to control the third person and prevent him from harming others. * * *

"However, the concept of duty is interrelated with the foreseeability that the third person would engage in that particular type of conduct which caused the harm. [Citations omitted.] Thus, '[t]he custodian of an insane person ordinarily is not liable for the tortious acts of such person which he could not reasonably anticipate, but he may be liable where he fails to exercise reasonable care under the circumstances'. (Footnotes omitted.) 44 CJS, Insane Persons, § 125, p 282." *Knight v Michigan, supra,* p 236.

Following *Knight,* we hold that a psychiatrist owes a duty of reasonable care to a person who is foreseeably endangered by his patient.

Danger to a third person is foreseeable only where the psychiatrist "determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another * * *". *Tarasoff, supra,* p 431; 551 P2d 340. Psychiatry, we recognize, is not an exact science. Medical doctors cannot predict with perfect accuracy whether or not an individual will do violence to himself or to someone else. Thus, we hold a psychiatrist to only the standard of care of his profession. That standard "must take into consideration the uncertainty which accompanies psychiatric analysis. * * * The concept of 'due care' in appraising psychiatric problems, assuming proper procedures are followed, must take account of the difficulty often inevitable in definitive diagnosis." *Lipari v Sears, Roebuck & Co, supra,* p 192, quoting *Hicks v United States,* 167 US App DC 169, 179; 511 F2d 407, 417 (DC, 1975). Thus, a psychiatrist will not be held liable for his patient's violent behavior simply because he failed to predict it accurately.

We hold a psychiatrist to only his professional

standard of care because in imposing a legal duty we must consider, besides the foreseeability of harm, the burden on the defendant. See *Samson v Saginaw Professional Building, Inc,* 44 Mich App 658; 205 NW2d 833 (1973), *aff'd* 393 Mich 393 (1975). To require a psychiatrist to use due care to protect another whenever he encounters the slightest hint that his patient might endanger that person would be an intolerable burden. We recognize that some mentally ill persons may issue threats to other individuals without intending to follow through. *Tarasoff, supra,* p 441; 551 P2d 347. Yet other patients may, according to medical standards, pose an actual danger to another person. We impose no onerous burden by insisting that a psychiatrist, like other physicians, abide by the standards of his profession.

The defendant suggests that imposing on a psychiatrist a duty to use due care in protecting others endangered by his patient will cause more patients to remain hospitalized. Imposing liability, the defendant argues, will cause psychiatrists to more often detain patients in the belief that "its better to be safe than sorry". This presupposes, however, that a psychiatrist will put his own interests above those of his patient. Perhaps the cynical believe that a psychiatrist will refuse to discharge his patient for fear of incurring liability even though the doctor recognizes that under medical standards his patient should be released. We refuse to adopt such a view. Regardless of their potential liability, we believe that psychiatrists will comply in good faith with the standards of their profession. We cannot agree with defendant that imposing liability on psychiatrists, under limited conditions, for their patients' acts will interfere with achieving society's goal of reducing unnecessary hospitalization of the mentally ill.

The class of persons to whom a psychiatrist owes this duty of due care is by no means unlimited. The plaintiff in this case urges that this duty extends to all persons who might foreseeably be injured by the patient. We consider it more sensible to limit the duty to only those persons readily identifiable as foreseeably endangered.

Plaintiff relies on *Lipari v Sears, Roebuck & Co, supra,* construing the law of Nebraska. In that case, a former mental patient at a Veterans Administration hospital shot and killed Dennis Lipari with a shotgun he had purchased from Sears. Lipari's estate sued Sears and Sears, in turn, filed a third-party complaint against the United States. In its complaint, Sears alleged that the V. A. was negligent in that it knew or should have known that the assailant was dangerous to others and should have taken the customary measures for treating such persons. The V. A., however, had no hint that its patient would attack Mr. Lipari. The Court, nevertheless, found this to be no bar to the V. A.'s liability.

Plaintiff also cites several Michigan cases in support of its position including *Moning v Alfono, supra.* In *Moning,* the plaintiff was injured when a pellet, fired from a slingshot manufactured by Chemtoy Corporation, struck him in the eye. The Court held that the manufacturer owed a duty to persons affected by the product and that this "obligation extends to persons within the foreseeable scope of the risk". *Id.,* p 439. The plaintiff in *Moning,* while not identifiable, was within the scope of the foreseeable risk. Nevertheless, *Moning* did not hold that in all cases foreseeability defines the scope of the defendant's duty. Rather, the scope of duty is in part dependent on underlying social policies. In a products liability case, such as

*Moning,* the manufacturer's liability is extended to all persons foreseeably affected by the product because the manufacturer is in the best position to prevent the harm that may result from its conduct. See *Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 97-98; 133 NW2d 129 (1965).

Various policy considerations dictate that a psychiatrist at a mental hospital should be under no duty to protect the public-at-large when his patient makes a generalized threat. These considerations were explained in *Thompson v County of Alameda,* 27 Cal 3d 741, 752; 167 Cal Rptr 70; 614 P2d 728 (1980). The court pointed out that "the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed." *Id.,* p 752, quoting *Tarasoff v Regents of University of California, supra,* p 441; 551 P2d 347. Announcing every generalized threat to the outside world would seriously undermine a therapist's efforts to gain the trust of his patient. A trusting relationship is necessary to achieve positive therapeutic effects. We seriously doubt that a warning to the public-at-large about a patient's threats would be of much benefit. Because some mental patients commonly make generalized threats, notifying the public of each threat would "produce a cacophony of warnings that by reason of their sheer volume would add little to the effective protection of the public". *Thompson v County of Alameda, supra,* pp 754-755; 614 P2d 735. Only a person warned that he is threatened personally is likely to heed such a warning.

We agree with *Thompson,* therefore, that a psychiatrist's duty to exercise reasonable care in protecting others foreseeably endangered by his patient extends only to potential victims who are

"readily identifiable". See, also, *Leedy v Hartnett,
supra; Mavroudis v Superior Court of San Mateo
County,* 102 Cal App 3d 594; 162 Cap Rptr 724
(1980).

In summary, when a psychiatrist determines or,
pursuant to the standard of care of his profession,
should determine that his patient poses a serious
danger of violence to a readily identifiable person,
the psychiatrist has a duty to use reasonable care
to protect that individual against such danger.

## B

Deciding whether the defendant owed a duty of
due care to Mollie Barnes requires review of the
evidence. We must determine whether the defen-
dant knew or pursuant to the standards of psychi-
atry should have known that John Patterson posed
a serious danger to a readily identifiable person,
namely, Mollie Barnes. Because defendant appeals
from a denial of his motion for judgment notwith-
standing the verdict, we must view the evidence
presented at trial and all legitimate inferences
therefrom in a light most favorable to the plaintiff
and determine whether reasonable people could
differ as to this fact issue. See *In re Dunlap Estate,*
67 Mich App 247; 240 NW2d 762 (1976).

Both parties offered lengthy testimony as to
whether, under applicable medical standards, John
Patterson posed a danger to others. For example,
Dr. Tanay, plaintiff's expert, testified that Patter-
son was "violence prone".[1] On the other hand, Dr.

[1] "*Q.* Do you have an opinion based upon a reasonable degree of
psychiatric certainty as to whether or not John Patterson was a
violent prone individual, either to himself or others?

"*A.* The history clearly indicates he was violence prone. A disorga-
nized person has no control over their behavior or emotions. So one
can anticipate if they are inclined to aggressiveness that they will be
aggressive in one form or another. The exact form of the aggression

Fischhoff, testifying for defendant, found "no indication" that Patterson posed a danger to others.[2] As to the threat posed to Mollie Barnes in particular, the evidence consisted primarily of one entry in a hospital record. On November 12, 1973, a physician at the emergency unit of Detroit General Hospital noted that Patterson's aunt, Ruby Davis, reported that Patterson "paces the floor and acts strangely and keeps threatening his mother for money". We note first that these threats were directed to a specific person, not to the general public. Thus, Mollie Barnes was a readily identifiable potential victim. Second, the defendant was apparently aware of these threats, but found them to be too remote to have any significance. Nevertheless, a jury could have found that defendant should have realized these threats would recur after Patterson's discharge. Patterson had threatened his mother to obtain money. When Patterson entered Northville for the last time before the

cannot be anticipated, but that some things are likely to occur that will be harmful. I think that could be. It's anticipated in a case of this sort where you have a person preoccupied with delusions that involve paranoid feelings, where he talks about the devil, where he feels that people, poisoning, drunks; these are all projections of his own rage, his own feelings he cannot control, and the form that it will take depends on the environmental circumstances. You know, he could have done something else, depending on what else would have developed in his environment. I don't know if I'm making myself clear.

"You cannot anticipate what will happen in terms of actual events, but that something would happen without care and external control, that I think you can anticipate, just like if you let a little child loose, you don't know what will happen, but you know something unfavorable will happen or is likely to happen."

[2] "*Q.* Are you ever able to anticipate the course of an illness such as this?

"*A.* You mean what is going to happen from ten years from now, how the person will be?

"*Q.* Or two months from now, how is that?

"*A.* It is quite difficult. Violence, I'm sure everyone in the courtroom knows, is something that is very difficult to predict whether, they are mental patients or not mental patients, and there was no indication that he was going to harm his mother or harm himself or harm anybody in his family or the community for that matter."

shooting, the hospital records reveal he had no money with him. Presumably, he would continue to need money after his release and would have the same motivation to threaten his mother. As Dr. Tanay explained to the jury:

"He was, as indicated, an alcohol and drug dependent person in addition to being psychotic. Absolutely, to get drugs and/or alcohol, you need money, and this individual would have to get that money from somebody. His mother was one possible source."

Properly viewed, this evidence is sufficient to support a jury finding that defendant should have known, pursuant to applicable medical standards, that Patterson posed a serious threat to his mother.

We hold, therefore, that the jury could have found that defendant owed a duty to exercise reasonable care to protect Mollie Barnes against the dangerous tendencies of John Patterson.

### III

Defendant next argues that his alleged negligence is not the proximate cause of Mollie Barnes's death, due to the presence of several intervening causes. It is well-established that an intervening cause is not an absolute bar to liability. Rather, liability is preserved if the intervening event is foreseeable. *Moning v Alfono, supra,* p 441. This rule applies even where the intervening event is the intentional, criminal or negligent act of another, *Johnston v Harris,* 387 Mich 569; 198 NW2d 409 (1972); *Davis v Thornton, supra.*

The chief intervening cause between the defendant's negligence and Mollie Barnes's death is the criminal act of Patterson. Our analysis of defen-

dant's duty to Mollie Barnes also determines whether Patterson's crime broke the connection between defendant's negligence and Mollie Barnes's death. The questions of duty and proximate cause both depend largely on foreseeability. See *Moning v Alfono, supra,* p 439. We decided that a jury could find that Patterson posed a foreseeable danger to the safety of his mother. Consequently, Patterson's act in itself does not remove Mollie Barnes's death as the proximate result of defendant's negligence.

Defendant argues that the availability of a loaded gun in the Bell household and Mollie Barnes's struggles to disarm her son were also unforeseeable intervening causes. It is well known, however, that many persons keep handguns readily accessible for protection. It is equally well known that a person threatened with a gun may attempt to disarm his assailant. The intervening events identified by defendant, therefore, were foreseeable.

We conclude that a jury could have found that defendant's negligence was the proximate cause of Mollie Barnes's death.

## IV

Defendant's remaining arguments require little discussion. First, defendant contends that the jury's finding that he was negligent in failing to protect Mollie Barnes is against the great weight of the evidence. Defendant's motion for judgment notwithstanding the verdict raised this claim. We review the denial of this claim for abuse of discretion. *Murphy v Sobel,* 66 Mich App 122; 238 NW2d 547 (1975). The evidence presented at trial discloses that defendant warned neither Mollie Barnes nor any member of her family of Patter-

son's dangerous propensities. Nor was there evidence that defendant took any other protective measures. Consequently, the trial court did not abuse its discretion by deciding that the jury's finding of negligence was not against the great weight of the evidence.

Second, defendant argues that the trial court abused its discretion by denying his motion to amend his witness list. GCR 1963, 301.10, applicable only to Wayne County, provides:

"Notice of pretrial conference shall be forwarded by the court to all counsel of record at least 6 weeks prior to the date of such conference. Within 10 days after receipt of such notice, counsel shall exchange lists of all witnesses to be called at the trial. *No witness may be called at the trial of the case unless listed in such exchange of witnesses, except by leave granted upon a showing of good cause.* (Emphasis added.)

In his motion, defendant sought to amend his witness list to include Dr. Elliott Luby and Dr. Lynn W. Blunt as expert witnesses. Defendant, however, had adequate reason to know, prior to the time witness lists were exchanged, that he might need to utilize witnesses such as Drs. Luby and Blunt. As defendant admits, he intended the testimony of these witnesses to support defendant's position that he acted in accordance with professional standards. It was clear from plaintiff's complaint that defendant's professional negligence would be an issue in the case. Consequently, the trial court did not abuse its discretion by denying defendant's motion to amend his witness list.

Third, defendant maintains that plaintiff cannot recover for the damages incurred by Ruby Davis, Exola Bell, Clinton Bell and Eddie Bell, the sisters and brothers of Mollie Barnes, under MCL

600.2922(2); MSA 27A.2922(2), because the decedent was survived by her husband, son and father. Defendant's argument was recently rejected by the Supreme Court in *Crystal v Hubbard,* 414 Mich 297; 324 NW2d 869 (1982). In that case, the Court upheld an award of wrongful death damages recovered by the decedent's siblings even though the decedent was survived by her father and mother. The Court held that, under the statute, the class of persons that may recover wrongful death benefits includes the potential—not only the actual—intestate heirs of the decedent's personal property. Because the decedent's siblings were potential heirs of their sister, the Court upheld their recovery. Similarly, because Mollie Barnes's siblings were potential heirs of their sister, MCL 700.106; MSA 27.5106, we hold that the wrongful death statute authorizes plaintiff's recovery for their damages.

Finally, defendant urges us to set aside the jury's award of damages as excessive. Courts are reluctant to set aside jury verdicts in personal injury cases on the ground that they are excessive. *Stevens v Edward C Levy Co,* 376 Mich 1; 135 NW2d 414 (1965). As the Supreme Court noted recently:

"In *reviewing damage awards in cases tried to juries,* this Court has asked whether the award shocks the judicial conscience, appears unsupported by the proofs, or seems to be the product of improepr methods, passion, caprice, or prejudice; if the amount awarded fails reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation for the injury sustained, the verdict has not been disturbed." *Precopio v City of Detroit,* 415 Mich 457, 465; 330 NW2d 802 (1982).

Damages were requested only for the loss of love

and affection to Mollie Barnes's siblings. There was testimony to the effect that Ruby Davis had a close relationship with Mollie Barnes. Ruby Davis testified that she and her sister lived near each other in the 12 years before her sister's death. They saw each other frequently, communicated by phone daily, shopped together and traveled together. What emerges from the testimony is a close and affectionate relationship. Clinton Bell testified that he and his family often visited Mollie Barnes and that he loved his sister. While Exola Bell, who lived in a different state, saw her sister less frequently, she testified that she had a good relationship with her sister and spoke with her on the phone every other week. Moreover, we cannot ignore that the circumstances of Mollie Barnes's death must have had an unusually severe impact on Exola Bell, for Mollie Barnes was shot to death in the presence of Exola Bell with her personal gun and in her own home. Although there was little testimony as to the relationship between Eddie Bell and Mollie Barnes, we find that the damages sustained by the other three siblings justify the $500,000 jury award.

Affirmed. No costs, a significant public question being involved.

BRONSON, J., concurred.

CYNAR, J. (dissenting). While recognizing that the writing of the majority opinion required lengthy study and consideration, I must respectfully dissent for the reason that defendant is not liable because he is protected from liability by governmental immunity.

The Michigan Supreme Court has specifically ruled that the operation of a state mental hospital is a governmental function. *Perry v Kalamazoo*

*State Hospital,* 404 Mich 205; 273 NW2d 421 (1978). The care, treatment, custody, diagnosis, evaluation and release rendered by Northville State Hospital constituted the performance of a governmental function which provided the state with the defense of immunity from liability.

Immunity afforded to the Northville State Hospital extends to an individual staff psychiatrist employed by Northville State Hospital while acting within the scope of a governmental function. *Fuhrmann v Hattaway,* 109 Mich App 429; 311 NW2d 379 (1981), *lv den* 414 Mich 858 (1982). The defendant, at all times relevant to this case, was a psychiatrist at the Northville State Hospital, a state mental hospital, where the specific activity complained of arose out of the exercise or discharge of a governmental function.

In *Fuhrmann,* the Court concluded that the Center for Forensic Psychiatry performed a governmental function. Further, the Court concluded that the defendant psychiatrists were "acting within the scope of a governmental function. As such, they are cloaked with governmental immunity." *Fuhrmann, supra,* p 435. Additionally, the Court continued by reviewing the case under the discretionary/ministerial standard:

"Plainly, the activities of the defendant psychiatrists are anything but ministerial. The decisions required of these persons are perhaps the ultimate in discretion. To determine the state of a person's psyche is in itself a task requiring great discretion and when this task is conjoined with the even more imposing job of resolving another's liberty, the consequent decision cannot be said to be 'ministerial' in any sense of that word." *Fuhrmann, supra,* p 436.

The majority of the Supreme Court has held, in

effect, that a public employee is protected by governmental immunity if the alleged tortious conduct falls within the "scope of his employment". See *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979).

Under the facts in this case, the defendant is cloaked with governmental immunity from liability whether we apply the "scope of employment" or the discretionary/ministerial standard.