**William SOUTEAR, Personal Representative of the Estate of Nancy Jane Soutear, and William Soutear, Individually, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 83–3703.

United States District Court, E.D. Michigan, S.D.

Oct. 28, 1986.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

On June 7, 1982, Garry Soutear, a former psychiatric patient at the Allen Park Veterans Administration (VA) Hospital, attacked his parents with a knife, causing the death of his mother, Nancy Soutear, and the injury of his father, William Soutear. This wrongful death action, brought by William Soutear, individually and as administrator of the estate of Nancy Soutear, against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* (1982), alleges that medical personnel at the VA hospital were negligent in releasing Garry Soutear and in failing to warn his parents that Garry posed a danger of physical violence to them. The matter was tried by the court without a jury. The following represents the court's findings of fact and conclusions of law.

Garry Soutear was first diagnosed as suffering from schizophrenia, chronic undifferentiated type, in early 1980 while he was in the Army, stationed in Germany. He was transferred from the military hospital in Germany to the Fort Hood Army Hospital at Sheppard Air Force Base in Texas on March 1, 1980. Upon admission, it was noted that Garry was alert, oriented in all spheres and cooperative. He denied any hallucinations, body image distortions or other signs of perceptual disorder. He was rather guarded in sharing his thoughts but did reveal interests in unusual dietary practices, including eating dog meat, and in spiritual and occult matters. Some loosening of associations was noted, but otherwise his thought processes were in the normal range. There was no homicidal or suicidal ideation. His memory was intact, but he manifested no insight into his problems and his judgment appeared to be impaired.

During his hospitalization at Sheppard, Garry deteriorated when his medication was discontinued. Four to six weeks after reinstitution of medication, his symptoms improved, with reintegration of his personality and a return to something approxi-

Stuart Freedman, Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick, Detroit, Mich., for plaintiffs.

Pamela J. Thompson, U.S. Attorney's Office, Detroit, Mich., for defendant.

mating his premorbid level of functioning. Garry was discharged from the hospital in May of 1980 with a diagnosis of schizophrenia, chronic undifferentiated type, in partial remission. He was subsequently found unfit for active duty and later retired from the Army on a medical disability.

Garry returned to his parents' home in Shelby Township, Michigan and was first seen at the outpatient Mental Health Clinic at the Allen Park VA Hospital on July 15, 1980. He was referred to staff psychiatrist Thaddeus Kosinsky who, following an interview during which Nancy Soutear was present, diagnosed Garry as suffering from schizophrenia, chronic undifferentiated type.

On August 1, 1980, Dr. Kosinsky met with Mr. and Mrs. Soutear to apprise them of Garry's condition and to explain to them what they could expect in terms of the course of the illness and its prognosis. When Garry returned for his scheduled appointment on August 6th, Dr. Kosinsky noted that he was exhibiting increasingly serious physical side effects from the prescribed medication, Haldol, and therefore recommended Garry's admission to the hospital for treatment and evaluation.

Garry was an inpatient at the Allen Park VA for approximately one month. During this period his treating physician was Dr. Reddy. On admission Garry was anxious, apprehensive, defensive and evasive but was communicative and displayed no thought disorder or manic symptoms. He denied hallucinations and suicidal or homicidal intent or plans and was not overtly delusional. However, he had little or no insight into his psychological problems, blaming them on the Haldol.

After supportive psychotherapy, he gained trust and was willing to express some of his fears and disappointments to Dr. Reddy. Garry explained his interest in parapsychology, witchcraft, the occult, religion and philosophy as an attempt to understand his disturbed state. He exhibited periodic anger and hostility toward staff members, other patients and his family. He was seen on three occasions with his family and seemed to show appreciable improvement in his thinking, mood and behavior toward them after three weeks of treatment. During his hospitalization, Dr. Reddy, as well as numerous other staff who had contact with Garry, noted that he exhibited no signs or symptoms of self-destructive thoughts or plans and was not dangerous to himself or others.

Following his discharge, Garry was seen in the Mental Health Clinic by Dr. Kosinsky on an outpatient basis in September, October, November and December. On each occasion, Dr. Kosinsky noted that Garry was not suffering from a thought disorder, hallucinations or delusions and was neither homicidal or suicidal. In January Garry's condition began to deteriorate and he was again admitted to the Allen Park VA hospital on January 20, 1981. Mr. Soutear brought his son to the hospital that evening because Garry was continually pacing and unable to sleep. Nancy Soutear later indicated in a telephone conversation with staff at the Battle Creek VA hospital that Garry had been brought to the hospital because of bizzare behavior which included constant pacing, not eating or sleeping and discussing masturbation with his sisters. She also reported that on one occasion Garry started screaming and swearing in a crowd of people at a shopping mall and had displayed similar behavior in a bar where he got into an altercation regarding ice in his glass. On that occasion, Garry put the ice in an ashtray, but on neither occasion was there any report of physically violent or assaultive conduct.

In his deposition, Mr. Soutear stated that on the evening of this admission his son was too sick to discuss hospitalization and that Garry was unaware of where he was being taken until they arrived at the hospital. While waiting to be admitted, Garry began cursing and swearing at others in the lobby. This behavior was directed particularly toward a cleaning woman working in the waiting room at whom Garry threw cigarettes. The federal police were summoned and Garry calmed down without being physically restrained. Garry was hos-

tile, uncooperative and refused to answer admitting staff's questions.

The progress notes from the Allen Park hospital for the January, 1981 admission indicate that Garry's behavior was very inappropriate. He was hyperactive and restless, with a short attention span and poor insight and judgment. On January 30, 1981, he was transferred voluntarily to the Battle Creek VA hospital, the VA facility for long-term treatment, where he remained for approximately eight months, until September 24, 1981.

Garry made little significant improvement until July of 1981. Notations from August and September indicate that he was acting in a more responsible, mature manner and assuming more responsibility for himself. He was reported to be sociable and active, alert, rational and in contact with reality. His behavior and verbalization were appropriate; he was calmer, and did not pace the ward.

Garry was discharged in late September, 1981 to a residential care home. The discharge summary indicated that he was neither homicidal nor suicidal. Within days of his placement at the residential care home, Garry argued with the home's sponsor and refused to follow the house rules. Garry called his mother, and against the advice of the social worker, was able to convince her to assist him in obtaining an apartment.

Garry was seen at the outpatient Mental Health Clinic at the Allen Park VA in October and November of 1981 and seemed to be doing relatively well. In early December, Garry called the Mental Health Clinic asking if his medication could be sent to his home. He refused Dr. Kosinsky's request that he return to the Clinic. In mid-December, Dr. Kosinsky called the Soutear home and spoke to Nancy Soutear who told him that Garry was not taking his medication and refused to seek treatment. This was Dr. Kosinsky's last contact with the Soutear family. At all times, his diagnosis of Garry's condition was schizophrenia, chronic undifferentiated type.

On January 29, 1982 Garry was brought to the Allen Park VA Hospital by his parents with an order signed by an Oakland County Probate Judge. The order had been issued upon Mrs. Soutear's petition and allowed a state hospital to hold Garry for twenty-four hours to perform an examination to determine whether he met the criteria for judicial commitment as a "person requiring treatment" under the Michigan Mental Health Code, M.C.L.A. § 330.-1400 *et seq.*

Section 401 of the Michigan Mental Health Code defines a "person requiring treatment" as

(a) a person who is mentally ill, and who, as a result of that mental illness can *reasonably be expected within the near future to* intentionally or unintentionally *seriously physically injure himself or another person, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.*

(b) a person who is mentally ill, and who as a result of that mental illness *is unable to attend to those of his basic physical needs such as food, clothing or shelter that must be attended to in order for him to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic needs.*

(c) a person who is mentally ill, *whose judgment is so impaired that he is unable to understand his need for treatment and whose continued behavior* as the result of this mental illness *can reasonably be expected,* on the basis of competent medical opinion, *to result in significant physical harm to himself or others.*

In the petition filed by Nancy Soutear on January 29, 1982, she circled the first and third criteria for commitment. However, in the subsequent narrative portion of the petition, requesting the petitioner to state the personal observations upon which the conclusion that the patient meets the criteria is based, Mrs. Soutear stated:

My son Garry is diagnosed as a chronic schizophrenic. Since his diagnosis as of February, 1980, he has spent approximately 1½ years in different hospitals. His last release was from VA Battle Creek in 10–81. He needs continuous outpatient medical care, plus medication. As of this time he refuses both. I feel as his mother he is not capable of making any competent decisions toward his condition. His judgment is impaired to the point to understand the need for treatment.

At trial, and in his deposition, Mr. Soutear testified that he and Mrs. Soutear sought hospitalization for Garry in January of 1982 because he was nervous, withdrawn, unable to relate or communicate with people, losing weight and doing strange things such as eating in restaurants without paying the bill and leaving his clothes wet after washing them.

The January 29th admission was effectuated after Mr. and Mrs. Soutear, Nancy's sister and her husband, Mr. and Mrs. Gomez, and two Rochester police officers had entered Garry's apartment. Garry was asleep, and the two officers went into the bedroom to awaken him. After some initial protestation, Garry dressed himself and agreed to go voluntarily to the Allen Park VA hospital rather than to the state hospital identified by the order. No threats were made in the apartment and the police did not accompany the family to Allen Park.

Mr. and Mrs. Gomez testified that while waiting to be admitted, Garry approached his mother and, without shouting or using aggressive gestures, stated that he was going to get even with her for trying to run his life by spreading her name all over the newspapers, and by embarrassing and humiliating her as she had done to him. No threat of physical harm was reported and this incident was not conveyed to physicians at Allen Park despite repeated questions regarding any threats Garry had made.

Garry signed an application for formal voluntary admission to the hospital. The admission note indicated that Garry was not actively suicidal, had no homicidal intent, denied hallucinations and delusions, but had been noncompliant in taking his medication.

On February 1, 1982, Garry was examined by Dr. Ruth Huggins, Chief of Psychiatry at the Allen Park VA Hospital. She found him to be fully oriented with a basic primary thought disorder, withdrawn, ambivalent, evasive, guarded and demonstrating loose associations. Although he was observed to be autistic, had a rich fantasy life, and was delusional, Dr. Huggins noted that the delusions were grandiose, not paranoid. Based upon Garry's responses to her questions with regard to his feelings about himself, his manifestations of anger, any history of attempts to hurt himself or others, what would make him angry enough to hurt someone, and whether he had either a preoccupation with or access to weapons, Dr. Huggins concluded that Garry was not homicidal or suicidal.

She further noted that although Garry was angry with his parents because of their attempt to commit him, he was more bewildered than angry and his anger was not extreme. At trial Dr. Huggins testified that anger and ambivalence in general, and in Garry's case specifically, are not manifestations of psychosis or indicators of potential homicidal or assultive behavior. She opined that Garry's anger was reality-based because his parents *were* trying to interfere in his life, albeit in a positive sense, by attempting to commit him. The fact that his anger had a basis in reality, as well as Garry's ability to verbally express it and the reasons for it were viewed by Dr. Huggins as a sign of health. Nor did Dr. Huggins find Garry's interest in the occult to be an indication of violence. He was not a member of a cult and his involvement was limited to reading books on the subject. His interest was not destructive, but rather, was an attempt to understand and help himself, a common response of the mentally ill to their problems.

During the course of her examination of Garry, Dr. Huggins received a telephone

call from Nancy Soutear. Mrs. Soutear told Dr. Huggins that she believed Garry needed hospitalization because he was not taking his medication, keeping his outpatient appointments or eating properly and because he was not doing anything with his life. She told the doctor that there were cigarette burns in Garry furniture and that he had knocked holes in the walls of his apartment, but she did not express any concerns about his potential to be dangerous to others. In response to Dr. Huggins' inquiries, Mrs. Soutear denied that Garry had a past history of assultive behavior, threats to harm others, or that he had access to or a preoccupation with weapons.

Since Garry could not continue to be held on the court order for examination, Dr. Huggins advised Mrs. Soutear to file another petition if she wanted him hospitalized. Dr. Huggins was concerned, based in large part upon her conversation with Mrs. Soutear, that Garry might not be able to meet his basic needs. Thus, he might have been subject to commitment under the second criterion of the Michigan Mental Health Code and she wanted him to remain hospitalized for further observation. Dr. Huggins testified that at the time she examined Garry, she did not believe that he met either the first or the third criterion for judicial commitment.

On February 2, 1982, Nancy Soutear filed a second petition with the Oakland County Probate Court. She again circled the first and third criteria, but provided the following basis for her conclusion that Garry met them:

Garry has been diagnosed to have chronic scizophrenia. As an outpatient he was instructed to be on continuous medication and treatment. As of the last four months he has refused to take any medication or now see any doctor. I believe his illness impairs his judgment as to the need for treatment. Garry is withdrawn, not thinking logical, cannot make proper decisions. He is not taking care of himself and has lost a lot of weight.

Upon admission Garry was placed on Ward B–7, a closed ward. His primary treating physician was Dr. Magdalena Beltran. When Dr. Beltran first examined Garry she found him withdrawn, guarded and oriented to time, place and person. His speech was coherent and he denied homicidal or suicidal ideas as well as auditory or visual hallucinations. She observed that Garry was angry toward his parents and ambivalent about almost everything. Garry denied his need for medication, his judgment was impaired and his affect flat.

Dr. Beltran's impression was "schizophrenia, paranoid, chronic, rule out schizophrenia, chronic undifferentiated." Dr. Beltran explained that by "rule out" she meant that a diagnosis of schizophrenia, chronic undifferentiated should be checked out or explored. She testified at trial that her impression was based on the fact that Garry was withdrawn, guarded and did not trust her. She did not, however, observe any paranoid delusions. Despite the fact that Garry was angry with Dr. Beltran and left the session before it was over, he did not shout, threaten, or attempt to strike her.

Dr. Beltran saw Garry again on February 3rd, 4th and 5th. It was her recommendation apparently that if Garry were to be committed, he should be transferred to Battle Creek for longer term treatment. Her notes of February 5th further indicate that Gary was not homicidal or suicidal.

On February 5, 1982, physician's certificates signed by Dr. Beltran and Dr. Lustre, another psychiatrist on Ward B–7, were filed with the Oakland County Probate Court certifying that Garry Soutear was a "person requiring treatment" under the Michigan Mental Health Code. Commitment proceedings were initiated by Dr. Beltran because of Garry's threats to leave and the staff's belief that he needed further observation. In the certificate Dr. Beltran stated that Garry met the criteria for judicial commitment because of his inability to attend to basic needs and his inability to understand the need for treatment. The factual basis for meeting both criteria was the same: that the patient refused to take medication, had no insight into his

mental illness and his judgment was impaired. Dr. Lustre indicated that Garry met the criteria for commitment because of his inability to understand the need for treatment. The diagnosis on both certificates was schizophrenia, paranoid.

Garry's commitment hearing was scheduled for February 16th. In the meantime, he was seen by Dr. Beltran on February 8th, 9th and 11th. During these examinations, Dr. Beltran never observed any hallucinations or paranoid delusions; Garry denied homicidal or suicidal ideas and was able to express his anger toward his parents verbally, without threats or violent gestures. Although he expressed anger at his parents for putting him in the hospital and felt that they were over-protective, he realized that they loved him. Dr. Beltran testified that Garry's desire to be left alone by his parents did not indicate that he might strike out at them. She further testified that his "preoccupation" was directed toward the upcoming commitment hearing rather than at his parents.

Based on her observations of improvement in both his ability to communicate and his behavior between February 2 and February 11, Dr. Beltran's final diagnosis of Garry's condition was schizophrenia, chronic undifferentiated. She testified that although she had believed Garry might be a danger to himself on February 5th when she filed her certificate, she no longer believed this to be the case on February 11th. She further testified that at no time during her treatment of Garry Soutear did she believe that he was dangerous to others.

As a protection to the civil liberties of the patient, the VA Hospital had a policy that the treating physician could not testify at a commitment proceeding. Since Dr. Beltran was the treating physician, and Dr. Lustre was due in another court on the date scheduled for Garry's hearing, Dr. Rajani Thangavelu, another staff psychiatrist, was asked to act as the "court physician." She first examined Garry in anticipation of her role at the commitment proceeding on February 12th. In a forty-five minute examination, she observed that he was fully oriented, coherent and pleasant, not delusional or hallucinating, and displayed no looseness of associations, although his affect was somewhat flattened. He was not homicidal or suicidal but he was somewhat restless and his judgment was impaired to the extent that he did not recognize his need for hospitalization or medication. On the basis of her examination and her review of his medical records, Dr. Thangavelu concluded that Garry did not meet the criteria for judicial commitment. Her plan was to continue Garry's hospitalization and observe him further. Garry, who dreaded commitment, agreed to this plan.

Dr. Thangavelu discussed her findings and conclusions with both Dr. Huggins and Dr. Beltran. Dr. Beltran explained that she had signed the certificate because she had wanted to observe Garry further but he had wanted to leave. Both Dr. Huggins and Dr. Beltran agreed with Dr. Thangavelu that Garry did not meet the criteria for judicial commitment at this point and concurred in her plan to observe him further.

Dr. Thangavelu phoned Nancy Soutear and explained that although she did not believe Garry met the criteria for commitment at that time, should the situation change, he could be committed in the future. She explored with Mrs. Soutear whether she was aware of any facts which might indicate that he should be committed. The only information volunteered by Mrs. Soutear was that Garry was refusing to keep his outpatient appointments and to take medication.

Dr. Thangavelu's examination of Garry on February 16th again revealed no evidence of overt psychosis. He continued to refuse medication but agreed to stay on an open ward a few days longer for observation. Following this examination, Dr. Thangavelu discussed the case with the staff on Ward B–7 and again with Dr. Huggins. All agreed that Garry did not meet the criteria and that he should be transferred to an open ward.

Dr. Thangavelu called Mrs. Soutear and told her that upon reevaluation Garry still

did not meet the criteria for commitment. She arranged a meeting with the Soutears for February 19th. Mrs. Soutear expressed no objection to Dr. Thangavelu's decision not to go forward with the commitment procedures, but stated that she and her husband wanted Garry to be involved in a vocational rehabilitation program.

The Probate Court and Garry's attorney were notified that the hospital did not plan to go forward with commitment proceedings. Both Dr. Thangavelu and Dr. Huggins testified that it is common practice for psychiatrists to file certificates indicating that a patient meets the criteria for commitment, and then to reverse that decision based on subsequent observation prior to the commitment hearing.

Dr. Thangavelu saw Garry individually on the morning of February 19th. During this session they discussed at length Garry's feelings toward and problems with his parents. He verbalized well and stated that he was angry with them because they were interfering with his life and treating him like a child. Although he continued to refuse medication, Garry agreed to seek outpatient therapy on a regular basis.

That afternoon, Dr. Thangavelu met with the Soutears, first separately and then with Garry present. During her discussion with the parents, Dr. Thangavelu again explored whether there was any history which might indicate that Garry met the criteria for commitment. She received negative responses to inquiries about past assaultive behavior, threats and either a preoccupation with or access to weapons. Dr. Thangavelu testified that if the Soutears had provided her with information at this point which indicated that Garry met the criteria, she would have reinstituted commitment proceedings. Mr. and Mrs. Soutear again reiterated their reasons for seeking Garry's hospitalization as his refusal to take medication or to participate in any activities. At this meeting the doctor also explained to Garry's parents that he would probably never return to his premorbid condition.

The parents agreed to be supportive but not overbearing, and Garry appeared to acknowledge his need for outpatient treatment and agreed to attend such sessions. Garry was advised to seek hospitalization if he found himself getting worse and his parents were encouraged to bring him back if his condition deteriorated. The Soutears expressed no disagreement with the hospital's decision not to pursue commitment and Garry was discharged that day, February 19, 1982. Dr. Thangavelu's discharge diagnosis, with which Dr. Huggins concurred, was residual schizophrenia.

Dr. Thangavelu had no further contact with Garry after his discharge. In late March or early April, Mrs. Soutear called Dr. Thangavelu to inquire about preparing a report so that Garry could get his drivers license back. In response to the doctor's inquiry regarding how Garry was doing, Mrs. Soutear replied, "about the same." She did not request Dr. Thangavelu's assistance in hospitalizing Garry. When Garry failed to return to the outpatient clinic, staff called his parents' home on April 14, 1982. Garry was not there, but his sister, who answered the phone, agreed to give him the message to call the hospital. On April 26, 1982, a follow-up letter was sent asking Garry to call the hospital within seven days. When he failed to respond, Garry's case was closed on May 4, 1982.

Garry had begun treating on an outpatient basis with a Dr. Senapiti and a social worker at the Pontiac General Mental Health Clinic on March 23, 1982. The records indicate that he was initially brought in by his parents because of inappropriate behavior such as failing to properly care for himself and his apartment and refusing to take medication. Following an examination on March 30, 1982, Dr. Senapiti diagnosed Garry as suffering from schizophrenia, residual type, chronic. He noted, however, that Garry showed no overt psychosis. The records from Pontiac General reveal no indication from either Garry or his family that he was then or had ever engaged in violent or assaultive behavior. Dr. Senapiti saw Garry on April 16th, May 4th and May 12th.

During April of 1982, three disturbing incidents occurred, all involving Garry and his sisters. Michelle Soutear testified that on one occasion in April, while she and Garry were at the airport, he began bumping into people, knocking them on purpose and making obscene comments. She testified that Garry chuckled and seemed to think it was funny. Michelle took him back to his apartment. Elizabeth Soutear testified that, on several occasions for a long time prior to the Spring of 1982, her brother had pulled out a hunting knife and displayed it to her. Her testimony that Garry carried a knife was corroborated by no other witness and is contradicted by the consistently negative family responses to routine hospital inquiries as to Garry's possession of weapons. It should be noted here that it was later revealed that a number of hunting and fishing weapons were kept in the Soutear basement, and that Garry and his father had hunted and fished together, over the years. No one at the VA hospital had been told of the weapons.

Elizabeth further testified that in the Spring of 1982 Garry cut up a dead squirrel and teased her with it. Around this same time, while their parents were vacationing in Florida, Elizabeth testified that as she was walking from the Soutear home to her cousin's parked car, Garry came running toward her from down the street. When Elizabeth got into the car and locked the doors, Garry began pounding on the car with his fists and yelling at her to let him in. He cursed at Elizabeth and her cousin and called them babies but finally broke into his parents' house, taking the keys to the family truck and sped away, nearly hitting another car.

William Soutear testified on deposition and at trial that Garry did well for six to eight weeks following his discharge from Allen Park, but then began to withdraw. On June 5, 1982, two days before Garry's attack on his parents, Garry and Mr. Soutear went fishing with a friend. Garry was quiet and withdrawn. Mr. Soutear did not see him again until June 7th, when he walked into the Soutear home and began the fatal attack upon his mother with a hunting knife, which he had obtained from the Soutears' basement. When Mr. Soutear intervened, he too was injured.

The liability of the United States under the Federal Tort Claims Act is to be determined in the same manner and to the same extent as that of a private individual under like circumstances. 28 U.S.C. § 2674. Section 1346(b) of the Act provides that the district courts shall have exclusive jurisdiction of civil actions on claims against the United States for personal injuries in accordance with the law of the place where the act or omission occurred. Because the alleged negligence occurred at the VA hospital in Allen Park, Michigan, the law of Michigan must be applied.

Plaintiff's claim is based on two theories of negligence. First, that the doctors at the Allen Park VA hospital were negligent in releasing Garry because he posed a risk of violence to his parents, and second, that the doctors negligently failed to warn the Soutears that they were potential victims. In Michigan, the elements which a plaintiff must prove in order to prevail on a cause of action for negligence are: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) damages suffered by the plaintiff. In addition, the plaintiff must establish that the defendant's negligence was the proximate cause of the injury for which damages are sought. *See Ghezzi v. Holly*, 22 Mich.App. 157, 177 N.W.2d 247 (1970).

In *Davis v. Lhim*, 124 Mich.App. 291, 335 N.W.2d 481 (1983), the Michigan Court of Appeals held that a psychiatrist has a duty to exercise reasonable care in protecting potential victims who are readily identifiable as foreseeably endangered by his or her patient. In order to determine whether a psychiatrist has breached this duty, a court must examine the applicable standard of care. The Michigan legislature has codified the standard of care to be applied in malpractice cases. Although the case at bar sounds in negligence and does not allege malpractice in the treatment of Garry Soutear, this court finds the legislature's

statement of the standard of care applicable to doctors in the malpractice context helpful. The statute provides in pertinent part:

In an action alleging malpractice, the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(b) the defendant, if a specialist failed to provide the recognized standard of care within that specialty and reasonably applied in light of the facilities available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

M.C.L.A. § 600.2912a; M.S.A. § 27A.291a.

Identification of the standard of care and a determination of whether it was breached in this case require expert testimony. At trial, testimony of the expert witnesses, Drs. Emanuel Tanay and Edward Salem for plaintiff, and Drs. Herbert Modlin and Elliot Luby for defendant, focused on the ability of a psychiatrist to predict dangerousness and violence in a patient and whether, in this case, the VA doctors knew or should have known that Garry posed a threat of harm to his parents. The testimony was interwoven with application and interpretation of the Michigan Mental Health Code's criteria for judicial commitment. All of the doctors who testified had reviewed the records in the case but only Dr. Salem had ever examined Garry, and that examination occurred over a year after the murder.

One area of disagreement among the experts was the diagnosis ascribed to Garry by the VA doctors. Dr. Tanay took issue with both the diagnoses of schizophrenia, chronic undifferentiated, and residual schizophrenia. Based on his review of the records, he believed that Garry was a paranoid schizophrenic. The significance of the distinction in this case as described by Dr. Tanay is that the paranoid schizophrenic experiences delusions of persecution, seeing himself as the victim of a conspiracy and therefore, presumably presents a risk

of harm to the "conspirators." Dr. Tanay stated that Garry's preoccupation with his parents, and Mrs. Soutear in particular, was evidence that he viewed his parents as persecutors. He testified that it is not unusual for a paranoid schizophrenic to have such delusions with regard to someone he loves, and added that "when a paranoid schizophrenic loves you, you'd better seek cover" because the love relationship is apt to turn to hate. Dr. Tanay also stated that he could not account for the change from the diagnosis of Drs. Beltran and Lustre of paranoid schizophrenia to that of Drs. Huggins and Thangavelu of residual schizophrenia and claimed that he had never seen such a dramatic change. Finally, Dr. Tanay testified that the term residual schizophrenia was outmoded and nondescriptive.

Neither the medical records nor the opinions of any of the other experts or treating doctors support Dr. Tanay's assessment that Garry was suffering from paranoid delusions. There is no evidence that Garry had prominent persecutory or grandiose delusions or convictions of delusional jealousy. His belief that he was not sick was not a delusion at all according to Drs. Modlin and Luby, but rather, a form of denial and a manifestation of his lack of judgment and insight. Nor was Garry's belief that his parents were trying to commit him a paranoid delusion because that in fact was their aim. Garry's view of himself as a college-bound professional, which Dr. Huggins characterized as a delusion, was described as grandiose rather than paranoid.

The primary diagnosis of Garry's treating doctors was schizophrenia, chronic undifferentiated type. Such a diagnosis is supported by manifestations of prominent loose delusions, periods of incoherent thinking, disorganized behavior and frequently auditory hallucinations. Drs. Modlin and Luby agreed with this diagnosis in Garry's case. A diagnosis of residual schizophrenia describes a patient in partial remission. Such a patient does not have a delusional system or experience such symptoms as auditory hallucinations but does present a

flat affect, is socially withdrawn, interacts poorly and may have loose thought associations. Dr. Modlin believed that the diagnosis of residual schizophrenia was appropriate in February of 1982 at the time of Garry's discharge. While Dr. Luby stated that he did not totally agree with the diagnosis, neither doctor believed it to be an outmoded term and both doctors agreed that patients frequently move from one form of schizophrenia to another, with exacerbations and remissions common. They explained that schizophrenia is a fluid, changing condition, with or without medication. Moreover, both Dr. Luby and Dr. Modlin most credibly testified that the fact that Garry later killed his mother does not mean that the diagnosis of the VA doctors was wrong. Considering the evidence and testimony presented at trial, the court finds no breach of the standard of care in the VA doctors' diagnoses of Garry Soutear's illness.

Despite the label ascribed to Garry's illness, the crux of plaintiff's argument is that Garry was in fact a danger to his parents and therefore should have been committed to the hospital in February of 1982. With respect to this argument, the parties elicited testimony from their experts regarding a psychiatrist's ability to predict violence, the means by which such predictions are made and the accuracy of such predictions.

Without specification, Dr. Tanay seemed to testify that Garry met the first and third criteria of the Michigan Mental Health Code's requirements for judicial commitment and that the hospital's failure to proceed with commitment was a breach of the standard of care. As explained above, the Michigan Mental Health Code allows involuntary commitment of a mentally ill person only if one of its three criteria is satisfied. The two criteria under which a prediction of dangerousness is relevant are (a) and (c):

(a) A person who ... can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself or another person, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

(c) A person ... whose judgment is so impaired that he is unable to understand his need for treatment and whose continued behavior ... can reasonably be expected ... to result in physical harm to himself or others.

Dr. Tanay's opinion that the VA doctors should have known that Garry presented a risk of harm to his parents was premised on his beliefs that Garry was a paranoid schizophrenic and that schizophrenics in general are more violent than the general population, as well as on Garry's continuous refusal to take medication. He testified that schizophrenics are people with tremendous amounts of rage and described the paranoid schizophrenic as a walking time bomb. In his opinion, long-term institutionalization is the only acceptable treatment for the overtly psychotic. Specifically, Dr. Tanay stated that living is only possible for the chronic psychotic in a mental hospital. Because the condition is chronic and life-long, he believes that such individuals need a structured environment and explained that it is not unusual for such patients to present no overt symptoms at times, nor that institutionalization results in an improvement in their symptoms. Such improvement, however, according to Dr. Tanay, does not warrant the patient's release, particularly if the patient refuses medication. He opined that the psychotic is unable to make the decision to take medication and therefore, the hospital should force the patient to do so. He found Garry's non-compliance with medication during the last hospitalization disturbing because it was clear evidence that he would refuse medication upon release and that his condition would deteriorate. He further took issue with the testimony of Drs. Huggins and Thangavelu in which they stated that Dr. Thangavelu had developed a therapeutic relationship with Garry. Dr. Tanay expressed the opinion that while psychotherapy is sometimes attempted with schizophrenic patients, it is usually ineffective and is most often used for educational pur-

poses. Permanent hospitalization and medication are the only safe and effective methods of dealing with schizophrenia in his view.

Dr. Tanay testified that he did not think past acts of physical harm are necessarily good predictors of future violence. Rather, he seemed to base his opinion that a patient poses a risk of violence solely on the fact of the patient's psychosis and stated essentially that all psychotics present a risk and require long-term, if not life-long confinement.

He further testified that psychotic homicide can be anticipated and that although a psychiatrist identifies a given state in a patient as of the time of the examination, that state may carry a potential or a risk of violence in the future. Dr. Tanay stated that once a patient is diagnosed as homicidal, the psychiatrist should be able to make a prognosis as to how long that state will last. However, when asked about the predictability of future violence in a patient found to be non-homicidal, Dr. Tanay replied that it would depend on the case. The only illumination he provided on this point was that he does not think that anyone enters or leaves the state of a potential for violence on a daily basis. In essence, it seems that Dr. Tanay's point was again that Garry Soutear was misdiagnosed and that he had actually been homicidal for some time prior to the attack on his parents.

In contrast to Dr. Tanay's testimony, defendant's experts testified that it is extremely difficult for a psychiatrist to predict dangerous behavior in a patient and that without a history of prior or current assaultive behavior, it is virtually impossible. According to Drs. Modlin and Luby, indications that a patient may be dangerous in the future include: whether the patient uses drugs or alcohol, past or current assaultive behavior, past or current threats of harm, and command hallucinations (voices telling the patient to harm himself or others). These experts cautioned, however, that even when threats have been made, clinical judgment is essential because many patients make such threats but very few carry them out. Moreover, plaintiff's own expert, Dr. Salem, upon questioning by the court concurred in the opinion of Drs. Modlin and Luby that it is extremely difficult to predict dangerousness. He likened it to trying to predict what someone will do when they are drunk, and added that the same person does not always behave in the same manner.

Further, defendant's experts testified that psychiatrists do not have the skills to predict dangerousness beyond an outside time limit which, in Dr. Modlin's opinion is two to four weeks and in Dr. Luby's opinion is approximately one week. Both agreed that a psychiatrist's ability to predict assaultive behavior does not extend to $3\frac{1}{2}$ months, the interval between Garry's release and the assault upon his parents. Accordingly, even if the hospital were negligent, its negligence could not have constituted the proximate cause of this tragedy.

Nor did Drs. Modlin and Luby agree with Dr. Tanay that schizophrenics are more dangerous than the general population. They relied upon studies supporting their position and discredited the literature relied upon by Dr. Tanay as having involved a much broader category of mentally ill persons than schizophrenics.

Both Dr. Modlin and Dr. Luby agreed that Garry did not meet any of the state's criteria for judicial commitment as of February 19, 1982. They noted that the fact that Garry had been without medication during the entirety of his last hospitalization without exhibiting any assaultive or violent behavior was an indication that violence could not be predicted for the future in his case. While both doctors opined that long-term hospitalization is almost always beneficial to the chronically ill, neither accepted Dr. Tanay's position that compulsory institutionalization is the only effective treatment or was required in this case. Although Drs. Modlin and Luby agreed that without medication, Garry could be expected to deteriorate at some time in the future, they did not envision that deterioration as necessarily including violent behav-

ior. Nor did defendant's experts opine that a therapeutic relationship can take the place of medication or hospitalization. Dr. Modlin, however, stated that a therapeutic relationship is very important and helpful in treating schizophrenic patients because they have difficulty in developing relationships of trust. He distinguished a therapeutic relationship from psychotherapy and identified the benefits of a therapeutic relationship as a basis upon which the patient is able to learn that the doctor is reliable, predictable and dependable.

Similarly, both of defendant's experts disagreed with Dr. Tanay's opinion that the VA doctors should have forced Garry to take his medication and they pointed out that the Michigan Mental Health Code prohibits medicating a patient against his will without a court order or unless the patient is immediately assaultive. Nor, under the Code is a patient's refusal to take medication by itself a sufficient basis upon which to commit.

Both defense experts agreed that the anger and ambivalence Garry felt toward his parents had no predictive value as to a potential for violence. They testified that ambivalence is no longer considered one of the cardinal indicators of schizophrenia and that all individuals experience fluctuating feelings at one time or another in personal relationships. These doctors simply did not equate anger with a potential for homicide without some predictor that Garry would express his anger violently. They noted that he had expressed his anger toward his parents and others in the past verbally, rather than by physically striking out at them.

Dr. Modlin and Dr. Luby testified that the appropriate standard of care required Dr. Thangavelu to carefully interview both the patient and his family, take a history of the patient, perform a mental status and a medical exam, familiarize herself with the observations of other staff with whom the patient had contact and review past medical records including those from other hospitals. Both doctors expressed their belief that Dr. Thangavelu met the standard of care and neither thought it incumbent upon her to have interviewed Garry's siblings.

■ Based upon its review of the evidence and the testimony presented at trial in this case, the court finds that neither the defendant's decision not to attempt to commit Garry Soutear, nor its failure to warn his parents of his potential for violence were negligent. Although hospitalization and medication would have undeniably been the best treatment for the patient, the decision of the doctors at the VA hospital to abandon legal commitment proceedings and the absence of a warning of dangerousness did not breach their duty to his parents.

■ A psychiatrist owes a duty of reasonable care only to persons "foreseeably endangered" by his or her patient. *Davis*, 124 Mich.App. at 301, 335 N.W.2d 481.

> Danger to a third person is foreseeable only where the psychiatrist "determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another." *Tarasoff* [*v. Regents of University of California*, 17 Cal.3d 425, 431; 131 Cal.Rptr. 14, 20; 551 P.2d 334, 340 (1976)]. Psychiatry ... is not an exact science. Medical doctors cannot predict with perfect accuracy whether or not an individual will do violence to himself or to someone else. Thus, we hold a psychiatrist to only the standard of care of his profession. That standard "must take into consideration the uncertainty which accompanies psychiatric analysis.... The concept of 'due care' in appraising psychiatric problems, assuming proper procedures are followed, must take account of the difficulty often inevitable in definitive diagnosis." *Lipari v. Sears, Roebuck & Co.*, [497 F.Supp. 185, 192 (D.Neb.1980)] quoting *Hicks v. United States*, ... 511 F.2d 407, 417 (D.C.Cir. 1975). *Thus, a psychiatrist will not be held liable for his patient's violent behavior simply because he failed to predict it accurately.*

*Davis*, 124 Mich.App. at 301, 335 N.W.2d 481 (emphasis added).

In this case, the VA doctors were clearly unaware that Garry was potentially dangerous to anyone. The question then becomes whether they *should* have known that he was likely to cause serious harm to another person. Based upon the record before it, the court does not so find. Despite Dr. Thangavelu's full compliance with all appropriate procedures she was simply unable to discern any persuasive evidence upon which to predict such behavior.

At the time of his discharge Garry's condition had improved despite his refusal to take medication. He was not overtly psychotic, delusional or hallucinating. He was coherent with no looseness of associations. He verbalized his feelings well, displayed no signs of homicidal or suicidal ideation and agreed to seek outpatient treatment. Dr. Thangavelu had interviewed or examined the patient on three occasions prior to the afternoon session with Garry and his parents on February 19th. She had reviewed his medical records and discussed the case with numerous other staff who had been in contact with Garry. In addition she, as well as other doctors at the VA hospital, had discussed the patient's condition with his family on several occasions and had been given no new information which would have supported commitment.

During interviews with the family inquiries were made regarding Garry's access to or preoccupation with weapons and as to whether he had ever threatened to harm anyone or had engaged in assaultive behavior. Mrs. Soutear did not report to the VA staff the only threat that Garry apparently ever made which was to get even with her by embarrassing her. Nor could Dr. Thangavelu have been aware of the jostling incident at the airport, the incident with the dead squirrel, or Garry's pounding on the car to which his sisters had testified because all three of these incidents occurred after his release. Even when Dr. Thangavelu spoke with Nancy Soutear on the phone in April of 1982 and inquired as to Garry's condition, Mrs. Soutear failed to advise her of this aggressive behavior. Moreover, the parents were advised that Garry would experience remissions and exacerbations of his illness and that he was expected to deteriorate. The Soutears were encouraged to seek his hospitalization upon the worsening of his condition. Despite the events of April, 1982, they did not do so.

Although the VA doctors were aware that the furniture in Garry's apartment had been burned by cigarettes, this behavior was interpreted as merely inattentiveness on his part and not predictive of dangerousness. Since the staff had ample opportunity to observe Garry in the hospital setting, this conclusion does not appear unwarranted. Similarly, neither Garry's treating physicians nor the experts who testified at trial viewed his interest in the occult as evidence of a potential for violence. Even Dr. Tanay noted that such interests are not uncommon in schizophrenics and therefore, presumably not significant.

In the considered opinion of Drs. Huggins, Beltran and Thangavelu, Garry did not meet the criteria for judicial commitment on February 19, 1982. Even those doctors who had earlier believed that he met the criteria had based their opinions on Garry's inability to understand the need for treatment and to attend to his basic needs. Dr. Beltran testified that although she believed that Garry might be a danger to himself on February 5th when she filed her certificate, by February 11th, she no longer believed this to be the case. At no time during her treatment of the patient did she believe that he was dangerous to others. By February 11th she had also revised her earlier impression of Garry as a paranoid schizophrenic and had formulated her final diagnosis of schizophrenia, chronic undifferentiated, a diagnosis which she obviously had suspected as a possibility since her first encounter with the patient.

In determining whether Garry met the criteria for judicial commitment under the Michigan Mental Code, the VA doctors made a specific finding as to the likelihood that he might cause serious harm to others. In their considered medical opinions he met none of the criteria. While Garry's ulti-

mate violent act demonstrates that he met the criteria at some point, the court cannot say by a preponderance of the evidence that he required commitment on February 19th. Nor does the court find that the doctors could have foreseen, based on the record, that he would have been dangerous 3½ months in the future. Mr. Soutear's testimony that Garry did well for six to eight weeks following his release is evidence of the reasonableness of the VA staff's decision to release him.

Having found that the doctors' opinion that Garry was not dangerous to *anyone* was formulated in accordance with the appropriate standard of care, the court also finds no breach of duty in the doctors' failing to warn the Soutears of their potential as Garry's victims. In the absence of other evidence, the fact that Garry was angry at his parents for their attempts to commit him and what he viewed as interference in his life is simply not sufficient for the court to find, contrary to every doctor who ever treated him and the most credible expert opinions, that the Soutears were foreseeably endangered by him. If the doctors had been able to determine that Garry was dangerous, perhaps the Soutears would have then become identifiable as foreseeably endangered. But again, in the absence of a basis upon which to reasonably conclude that the patient was dangerous to anyone, the question of whether the Soutears were foreseeably endangered must be answered negatively. Moreover, it appears that the Soutears were warned to the extent deemed necessary under the circumstances that the possibility of violent behavior should be anticipated in any schizophrenic patient. The warning was implicit in every doctor's repeated inquiries regarding weapons, threats and assaultive conduct and the Soutears were put on notice that Garry, by virtue of his illness, *could* become dangerous. This warning was sufficient in light of the dearth of evidence to suggest that Garry *would* become dangerous.

Were the court to adopt Dr. Tanay's point of view, it would be compelled to find that all schizophrenics require long-term commitment—a finding which would nullify the Michigan Mental Health Code. The Code, with which Dr. Tanay expressed his strenuous disagreement, is the law in Michigan and it appears to the court after hearing all of the testimony that it is not inconsistent with the practice of good medicine. Although it protects the rights of the mentally ill, it also allows a psychiatrist to confine an individual who, in the doctor's considered judgment, is likely to cause serious harm to himself or others. Sometimes doctors are wrong. Whether or not the VA doctors were wrong in this case to release Garry Soutear on February 19th, considering the record and the state of the art in psychiatry, the error, if indeed it was error, was not the result of negligence. This is not to minimize the tragedy that befell the Soutear family. However, to hold the United States liable when, despite its doctors' full compliance with all accepted procedures they were unable to discover any evidence upon which to predict such behavior, would be untenable. "To require a psychiatrist to use due care to protect another whenever he encounters the slightest hint that his patient might endanger that person would be an intolerable burden." *Davis*, 24 Mich.App. at 302, 335 N.W.2d 481.

Therefore,

IT IS ORDERED that judgment in this case is hereby entered for defendant and plaintiff's claim is hereby dismissed.

IT IS SO ORDERED.