**Paul Joseph MATT and Leah Rene Matt, b/n/f Paul Joseph Matt, Plaintiffs–Appellants,**

v.

**BURRELL, INC., Paul Goodwin, Al Clement, and Dr. Gordon McAfee, Defendants–Respondents.**

No. 18983.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 3, 1995.

---

Bob Bruer, Bruer & Wooddell, P.C., Springfield, for appellants.

Kenneth W. Bean and Joseph R. Hillebrand, Sandberg, Phoenix & Von Gontard, P.C., St. Louis, for defendant-respondent McAfee.

Glenn A. Burkart, Mann, Walter, Burkart, Weathers & Walter, L.C., Springfield, for respondents Burrell, Inc., Paul Goodwin and Al Clement.

FLANIGAN, Judge.

On August 26, 1994, this court issued an opinion in this cause. On October 27, 1994, by order of the Supreme Court of Missouri, this cause was transferred to that court. On January 24, 1995, the Supreme Court entered an order retransferring the cause to this court. The original opinion of this court, which follows, is now readopted and reissued.

This is an action for the wrongful death of Mary Lynn Matt, who died on December 20, 1990, as a result of a vehicular collision which occurred the previous day. Plaintiffs are her surviving husband and child. Count I of the petition sought recovery against defendants Burrell, Inc. ("Burrell"), Paul Goodwin, Al Clement, and Dr. Gordon McAfee. Count II sought recovery against LeAnn Olshavsky, the driver of the vehicle with which decedent's vehicle collided. The trial court dismissed Count I, on motion of the defendants, on the ground that it failed to state a claim upon which relief can be granted. Pursuant to Rule 74.01,[1] the trial court made its ruling with respect to Count I appealable on the express determination that there is no just reason for delay. Plaintiffs appeal.

Plaintiffs' first point is that Count I stated a claim for relief, and the trial court erred in ruling otherwise, because: (a) a special relationship of patient/mental health care providers existed between defendants and LeAnn Olshavsky which imposed a duty upon defendants to use reasonable care in controlling the conduct of LeAnn Olshavsky toward third persons such as Mary Lynn Matt; (b) defendants had "taken charge" of LeAnn Olshavsky, whom they knew or should have known to be likely to cause bodily harm to others if not controlled, thus, they had a duty to exercise reasonable care to control the conduct of LeAnn Olshavsky to prevent her from doing such harm; (c) "Under traditional tort principles a calculus of policy considerations dictates that a duty of reasonable care exists here."

---

1. All references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1986, V.A.M.S.

For the reasons which follow, this court holds that the trial court's order of dismissal was proper and that plaintiffs' first point has no merit.

■■■ When a petition is attacked by motion to dismiss for failure to state a claim, the mere conclusions of the pleader are not admitted. The facts alleged, however, are taken to be true and the pleader is entitled to all inferences fairly deducible therefrom. If such facts and inferences, viewed most favorably from plaintiff's standpoint, show any ground for relief, the petition should not be dismissed. A petition is sufficient when its allegations invoke principles of substantive law which may entitle plaintiff to relief or when it appears that plaintiff may be able to prove a set of facts which would entitle him to relief on his claim. The ruling on a motion to dismiss is ordinarily confined to the face of the petition, which must be given a liberal construction. *Boyd v. Lane,* 869 S.W.2d 305, 306 (Mo.App.1994).

■■ Count I alleged that decedent died as a direct result of a collision which occurred on December 19, 1990, when defendant Olshavsky "drove her vehicle into decedent's lane, colliding head-on with decedent's vehicle." Count I also alleged the matters set forth in the following eleven paragraphs:

Burrell is a community psychiatric rehabilitation center, providing comprehensive mental health services. Olshavsky was a patient of Burrell. Defendants Goodwin and Clement are psychiatric social workers who provided mental health services and treatment to Olshavsky and did so within the course and scope of their employment by Burrell. Defendant McAfee is a medical doctor specializing in the care of psychiatric patients. McAfee provided medical care and mental health services and treatment to Olshavsky during the course and scope of his employment by Burrell. "[A]lternatively, McAfee was a private physician rendering care and treatment to Olshavsky."

Olshavsky had been a patient of Burrell since May 1989, and the relationship continued through December 19, 1990. Olshavsky had 15 prior hospitalizations for mental illness, and she had made repeated attempts at suicide. Defendants knew of this history.

On December 19, 1990, Olshavsky "presented herself" to Burrell at its facility and was seen there by Goodwin and Clement. Olshavsky was mentally ill, depressed and suicidal. Her condition was reported to McAfee while she was there. Olshavsky stated that she was going to leave the Burrell facility and kill herself by wrecking her car. The four defendants knew her stated intent and knew she was a danger to herself and others if she were permitted to leave the Burrell facility. Defendants failed to stop her departure from the facility.

Burrell had taken charge of Olshavsky on and prior to December 19, 1990, in that Burrell had continuously diagnosed and treated Olshavsky since May 30, 1989. Burrell participated in Olshavsky's involuntary detention in August 1990, and early December 1990.

Burrell developed on an ongoing basis a "Critical Intervention Plan" in the event Olshavsky became a danger to herself or others. The plan included an involuntary 96–hour hold of Olshavsky should the need arise. The plan was in effect on December 19, 1990, and a copy is attached as Exhibit F.

Because of the foregoing circumstances, Burrell and its employees had a duty to restrain Olshavsky on December 19, 1990.

Burrell was negligent in failing to prevent Olshavsky from leaving the facility, in failing to diagnose and treat Olshavsky's mental illness, and in failing "to timely call the police or other authority to restrain Olshavsky."

Goodwin and Clement were negligent in failing to restrain and prevent Olshavsky from leaving the facility and in failing to call the police to restrain Olshavsky.

McAfee was negligent in failing to have Olshavsky restrained or prevented from leaving the facility, in failing to call the police to restrain Olshavsky, in failing to treat Olshavsky and in abandoning the care of Olshavsky, and "in discharging Olshavsky from the Marian Center, a facility for the mentally ill, on December 18, 1990, following a psychotic suicide attempt."

Goodwin was designated a mental health professional by Burrell. McAfee was designated a mental health professional by another health center located in Springfield, Missouri. Both were approved as mental health professionals by the Missouri Department of Mental Health for the period covering December 19, 1990. Burrell's own "Operational Guidelines" "for events as existed here on December 19, 1990," permitted the use of restraint of Olshavsky by its staff.

Decedent's death was the direct and proximate result of defendant's negligence, and plaintiffs were thereby damaged.

Decisions in other jurisdictions are in conflict on whether a duty of care is owed by a mental health facility or medical practitioner to an individual member of the general public, injured by a mentally ill person, for a decision to release the mentally ill person from confinement.

Out-state cases lending support, in varying degrees, to plaintiffs' argument that Count I states a claim for relief include the following: *Semler v. Psychiatric Institute of Washington, D.C.,* 538 F.2d 121 (4th Cir.1976); *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980); *Tarasoff v. Regents of University of California,* 551 P.2d 334 (Ca. banc 1976); *Perreira v. State,* 768 P.2d 1198 (Colo. 1989); *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693 (1982); *Estate of Mathes v. Ireland,* 419 N.E.2d 782 (Ind.App. 1981); *Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d 86 (1983); *Leverett v. State,* 61 Ohio App.2d 35, 399 N.E.2d 106 (1978); and *Petersen v. State,* 100 Wash.2d 421, 671 P.2d 230 (1983).

Out-state cases lending support, in varying degrees, to defendants' argument that Count I does not state a claim for relief include the following: *Currie v. U.S.,* 836 F.2d 209 (4th Cir.1987); *Brady v. Hopper,* 751 F.2d 329 (10th Cir.1984); *Hasenei v. United States,* 541 F.Supp. 999 (D.Md.1982); *Soutear v. United States,* 646 F.Supp. 524 (E.D.Mich. 1986); *Leedy v. Hartnett,* 510 F.Supp. 1125 (M.D.Pa.1981); *Morton v. Prescott,* 564 So.2d 913 (Ala.1990); *Thompson v. County of Alameda, Cal.,* 614 P.2d 728 (Ca. banc 1980); *Leonard v. State,* 491 N.W.2d 508 (Iowa 1992); *Cairl v. State,* 323 N.W.2d 20 (Minn.

1982); and *Jarrett v. Wills,* 235 Or. 51, 383 P.2d 995 (1963).

The principal Missouri case on which defendants rely to support the order of dismissal is *Sherrill v. Wilson,* 653 S.W.2d 661 (Mo. banc 1983). There plaintiff brought a wrongful death action against the state of Missouri and various hospital officials and physicians. A mental patient, one Corley, had been committed to a state hospital by court order. After being released on a two-day pass, Corley killed plaintiff's decedent. The petition alleged that the defendants were "grossly negligent" in releasing Corley on a pass when they knew of his severe mental illness and dangerous proclivities, and in failing to recapture him after he had overstayed his pass. The trial court held that the petition did not state a claim for relief, and this ruling was affirmed.

The court mentioned several statutes contained in Chapter 632, V.A.M.S., which became effective January 2, 1979, which was after the death occurred. The court pointed out it was not called upon "to interpret or to apply the new statutes." The court said that the case must be decided "on ordinary negligence principles."

The court said that the fatal attack did not occur until several weeks after Corley was due to return from his pass, but the court assumed "that the issuance of the pass was an event in the direct chain of causation." The court said that the question was whether the treating physicians, two of the defendants, owed "such a duty to the general public in deciding which involuntary patients should be released on pass, as to give rise to a civil action by a member of the general public for negligent exercise of judgment." The answer was "no."

The court said, 653 S.W.2d at 664:

"Corley was an involuntary patient, but he was not a convict. The law provides for involuntary confinement of persons in mental hospitals if it can be judicially established that they are dangerous to themselves or to the public, but the authority for confinement is hedged about by severe restrictions. The patients are required to be held in the least restrictive environment compatible with their

safety and that of the public, and are entitled to treatment. The treating physicians, in their evaluation of the case, well might believe that Corley could be allowed to leave the institution for a prescribed period and that his release on pass might contribute to his treatment and recovery. *We do not believe that they should have to function under the threat of civil liability to members of the general public when making decisions about passes and releases.* The plaintiff could undoubtedly find qualified psychiatrists who would testify that the treating physicians exercised negligent judgment, especially when they are fortified by hindsight. The effect would be fairly predictable. The treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued. Such a climate is not in the public interest." (Emphasis added)

The court cited, with approval, *Cairl* and *Jarrett*, both *supra*. The court distinguished *Tarasoff, supra,* an oft-cited decision, on the ground that *Tarasoff* involved a danger "to a particular individual, and the claimed breach of duty was the failure to warn that individual."

In *Sherrill,* 653 S.W.2d at 666, the court said: ˙

"The present petition contains *no allegation* that the defendant physicians were aware *that Corley posed a particular danger to the plaintiff's decedent.* In the later case of *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980), the Supreme Court of California recognized the distinction between a mental patient who is known to pose a threat to 'a foreseeable or readily identifiable target' and one who is alleged to be dangerous to the public generally. It distinguished *Tarasoff* in finding that *Thompson* did not involve a danger to any particular individual, and held that the defendants were not liable for negligent exercise of discretion. This case is similar to *Thompson.*" (Emphasis added)

Referring to *Mathes,* and *Semler,* both *supra,* the court said, at 666, that those two cases "rely on Section 319 of the Restatement (Second) of Torts, which has to do with the assumption of care and control of one known to be dangerous, and find liability with regard to the failure to restrain or the release of allegedly dangerous mental patients. The cases are distinguishable because Corley was involuntarily committed to the St. Joseph Hospital. Section 319 does not apply to the case before us."

The court said, at 667:

"We assume, as alleged in the plaintiff's petition, that the jury could find that Corley was a dangerous person with severe mental illness, and could also find that danger to members of the public, including the plaintiff, could be reasonably anticipated if he were released. Cf. *Virginia D. v. Madesco Hotel Co.,* 648 S.W.2d 881 (Mo. banc 1983). *We nevertheless conclude that the defendant physicians should not be held liable for even foreseeable civil damages simply because they might be found to have exercised negligent professional judgment in permitting him to leave the premises.* The decision to hold a person against his will is a very serious one, especially when the detainee has not been convicted of a crime. We believe that an 'actual holding of liability would have worse consequences than the possibility of actual mistake.' 2 Fleming & James, *supra,* Sec. 29.10." (Emphasis added)

The court said, at 668:

"[T]he persons responsible for Corley's custody and treatment *do not owe a civil duty to the general public,* with regard to securing his return. The recognition of a duty of this kind could place a severe burden on the public service. It would probably not be difficult in many cases to make a case for the jury as to the foreseeability of injury, but this is not sufficient to establish *a duty to the public at large.*" (Emphasis added)

The court said, at 668–669:

"The plaintiff cites § 202.430, RSMo 1969, now repealed, which authorizes state hospital authorities to call upon the local sheriff to assist in the apprehension of escaped or strayed inmates, and argues that there was an affirmative duty to give this notice. *Our Court, in recent years, has been reluctant to find an implied right to a civil action from a statute which does not refer to civil liability in express terms. Shqeir v. Equifax, Inc.,*

636 S.W.2d 944 (Mo. banc 1982). A minimum requirement is that the would-be plaintiff be a member of a class for whose benefit the statute has been enacted. 73 Am.Jur.2d Statutes, Secs. 432–33. The statute here cited was not passed for the benefit of a discrete class. Its primary purpose is to authorize one governmental agency to call on another for help. There is no indication of any special duty in the language of the statute. The statute does not clearly require the hospital authorities to notify the sheriff. A statute of this kind will not be read as conferring a civil action by implication. Nor may the plaintiff base a civil action on the duty of the hospital authorities to keep the committed person in custody as initially directed by the juvenile court.... We deal only with tort liability arising out of duties owed to the public at large.

"We conclude that it is in the public interest to deny a civil action against public employees who fail to secure the return to custody of a person temporarily released from a public mental hospital by decision of the attending physicians, for injury inflicted by the patient on a member of the general public.... *The treating psychiatrists do not owe duties to the public generally which will support tort liability for negligence.*" (Emphasis added)

*Sherrill* involved a patient who had been involuntarily committed to the hospital under court order. In this case, Olshavsky was a voluntary patient who "presented herself" to Burrell. At oral argument, plaintiffs' counsel conceded that that allegation meant that Olshavsky was a voluntary patient.

It seems, on reason, that where a duty of the type described in *Sherrill* does not arise in favor of the public generally, with respect to a patient involuntarily committed, a fortiori, no such duty arises with respect to the release of voluntary patients. See *Perreira v. State*, 768 P.2d 1198, 1209–1214 (Colo. 1989). Although *Perreira* is a case generally favorable to plaintiffs' position, that decision points out that the existence and extent of a psychiatrist's duty to protect others from violent acts of a mentally ill patient applies in varying degrees which "range over a continuum that reflects diverse levels of control over the patient's treatment with corresponding degrees of responsibility for the patient's actions." *Perreira*, at 1209. Under that holding, a duty with respect to the acts of a voluntary outpatient is less than that owed with respect to a voluntary inpatient, and the heaviest duty is imposed with respect to a person who has been involuntarily committed to a mental hospital by order of court.

Seeking to distinguish *Sherrill*, plaintiffs argue: "[*Sherrill*] is only concerned with official immunity issues. [The court] recognized the inequity of giving immunity to the state and its supervisors and not to the employees who were performing the discretionary duties of their principals."

This court does not read *Sherrill* so narrowly. Although *Sherrill* held that the state was protected from liability by the doctrine of sovereign immunity, that immunity was not available to some of the individual defendants. With respect to them, the court held that they owed no *duty* to the general public. In the absence of a duty, there could be no breach and thus no liability for the death. Any issue of immunity would come into play only if liability otherwise existed.

In *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443 (Mo. banc 1986), the court said, at 448 n. 4, that *Sherrill* held "that treating physicians owed no tort duty to members of the general public regarding the decision to release a mental patient under involuntary commitment."

Strangely, none of the parties to the instant appeal has cited any Missouri statute. Chapter 632, V.A.M.S., deals with "Comprehensive Psychiatric Services." Section 632.105 reads, in pertinent part:

"1. The head of a private mental health facility may, and the head of a department mental health facility shall, except in the case of a medical emergency and subject to the availability of suitable programs and accommodations, accept for evaluation, on an outpatient basis if practicable, any person eighteen years of age or over who applies for his admission....

"2. If a person is diagnosed as having a mental disorder, other than mental retardation or developmental disability without an-

other accompanying mental disorder, and is determined to be in need of inpatient treatment, the person may be admitted by a private mental health facility and shall be admitted by a department mental health facility, if suitable accommodations are available, for care and treatment as an inpatient for such periods and under such conditions as authorized by law. . . .

"3. A person who is admitted under this section is a voluntary patient and shall have the right to consent to evaluation, care, treatment and rehabilitation and shall not be medicated without his prior voluntary and informed consent; except that medication may be given in emergency situations."

Section 632.150 reads:

"1. A voluntary patient who has applied for his own admission may request his release either orally or in writing to the head[2] of the mental health facility[3] and shall be released immediately; except, that if the head of the facility determines that he is mentally disordered and, as a result, presents a likelihood of serious physical harm to himself or others, the head of the facility may refuse the request for release.

"2. If the request for release is refused, the mental health facility may detain the person only if a mental health coordinator, a licensed physician, a registered professional nurse designated by the facility and approved by the department, a mental health professional or a peace officer completes an application for detention for evaluation and treatment to begin the involuntary detention of the patient under this chapter."

Section 632.150.1 imposes a duty, subject to an exception, on a mental health facility to release immediately a voluntary patient who has, orally or in writing, requested the head of the facility to release him. The sole exception is that the head of the facility *may* refuse the request if he determines that the patient is mentally disordered and, as a result, presents a likelihood of serious physical harm to himself or others.

Count I of the instant petition contains no allegation that the head of the facility made such a determination.[4] Even if such an allegation had been made, as *Sherrill* points out, courts are reluctant to find an implied right to a civil action from a statute which does not refer to civil liability in express terms. *Sherrill* also stated that a minimum requirement is that the would-be plaintiff be a member of the class for whose benefit the statute has been enacted. As a member of the general public, plaintiffs' decedent would not meet that requirement.

Plaintiffs' first point has no merit. Although not essential to this holding, the court notes that Count I of the petition does not specifically allege that Olshavsky intentionally drove her vehicle into decedent's lane. Perhaps a liberal construction would, as plaintiffs argue, permit the word "drove" to be equivalent to "intentionally drove." Further, the statement attributed to Olshavsky was that she was going to kill herself "by wrecking her car." There was no allegation that she intended to wreck her car by colliding with another vehicle.[5] The matters mentioned in this paragraph do not affect, although they tend to support, this ruling.

Plaintiffs' second point is that the trial court erred "in finding that the allegation of abandonment of care by Dr. McAfee did not

---

**2.** As used in Chapter 632, "Head of mental health facility" means "superintendent or other chief administrative officer of a mental health facility, or his designee." § 632.005(6).

**3.** As used in Chapter 632, "Mental health facility" means "any residential facility, public or private, which can provide evaluation, treatment and inpatient care to persons suffering from a mental disorder or mental illness and which is recognized as such by the department. . . ." § 632.005(11).

**4.** Exhibit F, attached to the petition, does not constitute such a determination. It is dated September 6, 1990, and deals with a prior hospitalization of Olshavsky. It is signed by "Case Worker Al Clement," presumably the same person as defendant Clement. It contains no statement that Olshavsky "is mentally disordered and, as a result, presents a likelihood of serious physical harm to [herself] or others."

**5.** Count II, against Olshavsky, pleaded that Olshavsky was negligent in driving on the wrong side of the road. This appeal, however, does not concern the sufficiency of Count II, and Rule 55.10 permits alternative and inconsistent pleading of separate claims.

constitute a legal cause of plaintiffs' damages, and, therefore, the court erred in dismissing plaintiffs' petition as against Dr. McAfee for that reason."

In support of their second point, plaintiffs cite *Baird v. National Health Foundation*, 235 Mo.App. 594, 144 S.W.2d 850 (1940), and *Boyd v. Andrae*, 44 S.W.2d 891 (Mo.App. 1932). Those cases are distinguishable. In *Baird*, the plaintiff was the patient herself who sued her physician for "not following through" on her case. In *Boyd*, the plaintiffs were the parents of a nine-year-old girl, who sued a physician for failure to diagnose and treat the daughter's fractured hip. No physician-patient or hospital-patient relationship existed between instant plaintiffs, or their decedent, and defendants.

Plaintiffs' second point merely attempts to place a different label upon McAfee's decision, as well as that of the other defendants, to release Olshavsky. This point has no merit for the reasons expressed in the discussion of plaintiffs' first point.

The judgment is affirmed.